IN RE ESTATE OF GEORGE W. UNANGST.

EFFIE UNANGST, Appellee, v. CHARLES UNANGST, Administrator, Appellant.

No. 41094.

FEBRUARY 9, 1932.

Charles J. Haas and E. A. Johnson, for appellant.

Kirkland & St. Clair and Don Barnes, for appellee.

MORLING, J.—We find it necessary to decide but one question, and that is whether plaintiff has made a case for the jury on her claim to an implied contract with decedent for the services and board for which she seeks to recover. She pleads that the board and services were rendered under an implied contract with decedent that she would receive reasonable compensation therefor. The claim is in six items in the same form, the first from September 7, 1912, to September 7, 1917, 250 weeks, "for care, washing, ironing, mending, and board of George W. Unangst at $3 per week $750;" the second from September 7, 1917, to September 7, 1921, 200 weeks, at $4 per week, $800; the third from September 7, 1921, to September 7, 1925, 200 weeks at $5, $1000; the fourth from September 7, 1925, to September 7, 1927, 100 weeks, at $6, $600; the fifth and last from September 7, 1927, to August 17, 1929, 100 weeks, at $10, $1000,—total $4150. All of the items were submitted to the jury, who returned a verdict for $2765.

Decedent was the owner of a farm of 83 acres, which was the home of himself and family. His wife died in 1905. His son Joe, then unmarried, and granddaughter Jessie were members of the family and continued to live with him, Jessie doing the housework. There was an arrangement between decedent and Joe by which Joe rented the place for one-half of the corn and oats, $50 for the pasture, and $4 an acre for the hay land. In June, 1912, Jessie married, and left the farm. In September, 1912, plaintiff and Joe were married, plaintiff taking up her home with Joe on this farm. The furniture belonged to decedent, who continued in the home, and as plaintiff testifies, decedent and Joe "just continued the former arrangement. They didn't have any new contract from year to year. * * * Joe owned the stock, including horses and cattle. * * * They had settlements each year. I know that my husband paid his father

cash for the hay and pasture each year. They had their settlements usually at home, with nobody present but my husband, his father, and myself. * * * That continued clear down to the old gentleman's death in August, 1929. * * * About a month or so before the old gentleman died.'' At the time of plaintiff's marriage decedent was about 68 or 69. Plaintiff testified:

''Mr. Unangst, the old gentleman, occupied the house just the same after our marriage as before. He had a bedroom. * * * the rest of the house was used by the family: that is, by me and Joe and the old gentleman, and that continued clear down to the time of the old gentleman's death. The old gentleman ate at the table with the rest of the family. I did the cooking and the housework for the family, that is, myself and Joe and the old gentleman, during all of the years that I have lived there. I got the meals and did the family washing and looked after the house generally. I did that for the family. The old gentleman was the owner of the place, and when I moved there the house was furnished the same as when the old gentleman was living there with his wife, and the same furniture was there during the period after the old gentleman's wife's death down to the time when I went into the home as Joe's wife. The home was occupied there at the time I went in as it had been for a great many years, the same furniture and everything. * * * I was occupied there just as housewife on the farm, and have been ever since I was married, down to the present time. Joe was running the place. I mean by that that the old gentleman went on staying there and allowed Joe to stay there and have a share of the crop. * * * In 1912, immediately after our marriage, the old gentleman was working in the fields part of the time. He fixed fences a few days. * * * He did some plowing. * * * The old gentleman assisted in doing the chores and helped with the milking. He took care of the barn some, including the horses. He did his share of the milking * * * He assisted some with the other farm work. * * * The house needed some chimneys that fall. * * * He did that work. * * * Besides this he fixed what needed fixing about the buildings, mostly on the hen house. * * * He fixed up and repaired some other buildings. * * * The old gentleman was in reasonably good health that fall, and kept himself busy about the farm during all that fall. What I have

testified to with reference to what he did in the fall of 1912 was true, generally speaking, during the following year * * * The following year he assisted in planting the corn and in putting in the crop. * * * He took care of the garden all of the years up until the last. Besides that, he assisted some in putting in the crop, and assisted some in tending the crops and harvesting them and in doing the fall work. Sometimes he assisted in getting in the hay. * * * That continued during the subsequent years down to 1920 just about the same. * * * After 1920 he continued to help do the chores, assisted with the milking every winter. * * * In the winter of 1920 he did not help milk, because he had stomach trouble * * * Every winter after that he had spells with his stomach and couldn't help with the milking from 4 to 6 weeks. Up until 1925 he was still occupied on the farm, assisting with the work about as before. He was on the place assisting with the chores, taking care of the garden, assisting with the milking, fixing up and making necessary repairs about the farm. After 1925, the old gentleman continued to do some work about the farm. In winters he was confined to his bed, part of the time. * * * He continued his work, doing chores and making garden and so on, until about two years before his death. * * * During those years I was doing the cooking and keeping of the house. The expenses came from my chickens. The chickens paid the expense of keeping the house up. There was no arrangement that I know of between Joe and his father with reference to the chickens. My only means were those that I got from the farm, and what Joe did. Whatever went into the house was the proceeds that came from the farm. * * * I think I kept about 150 old hens each year, and then raised some chickens. The raising of these chickens was part of the means for getting income from the farm. * * * Those chickens belonged to me. With the proceeds from the sale of chickens and eggs I got groceries and what I needed for the house. The chickens were not fed from the old gentleman's grain. * * * In the lease of the premises by Joe there was no share that the old gentleman was to do, but he just did his share of the work, built fences and repaired buildings.''

There are more or less differences between claimant and her witnesses regarding details; but the foregoing is sufficient as a

general outline of the testimony, except that the evidence shows that claimant, during decedent's periods of ill health, was very attentive to his needs. She did his washing and ironing. There is no claim of any express contract concerning board or services.

A witness (Herger) testified that about 1915 or 1916 decedent "told me he was doing just what he felt like doing, to help pass away the time. No particular job. He said he had a good home, that they were taking good care of him. He could not expect a daughter to give him any better care than he was getting. He said he meant to take care of Effie (claimant) and see that she was paid for all she had done for him. I communicated this to Effie."

Plaintiff testified that she heard a conversation between Herger and decedent about the year 1915, "in which Mr. Unangst made some statement about expecting to see that I was compensated for what I had done and was doing."

Another witness (Crew) testified that about 12 years before the trial decedent said that claimant "makes me a good home, and I am better off there than I would be in a home of my own, * * * and he just pottered and worked when he liked. * * * That he intended to let her know that he appreciated it by returning it to her—I mean, returning value received for the nice things she did for him."

Another witness (Romig) testified that about 1926 "he told me he was receiving wonderful care, and he didn't know what he would do without Effie. * * * He wanted her to receive pay for what she had done for him. * * * I communicated to Effie Unangst what the old gentleman said about expecting to compensate her. I told her that about three years ago."

Another witness (Abbott) testified that about two years before decedent's death witness had a conversation with decedent, the substance of which was "that he would repay Effie for his care. He said she was good to him and waited on him, and waited on him at night with a hot water bottle to keep him warm, and whatever he wanted done."

Checks dated in 1919, 1920, 1923, 1925, and 1927, signed by Joe, payable to the order of decedent, were introduced, bearing decedent's endorsement. There was written upon them "for rent" or "for rent in full." There is no evidence of any com-

munication whatever between plaintiff or her husband and decedent concerning board or services.

It thus appears that Joe remained a member of his father's family after his mother's death. The family relationship continued unchanged except by the death of decedent's wife, the departure of Jessie, and the subsequent introduction of plaintiff. The home and the furniture belonged to decedent. No relationship between Joe and his father, so far as the home is concerned, is shown, other than that they were sole members of the family before plaintiff's marriage to Joe, after which the three of them continued to be the sole members (there were no children) until decedent's death. As between Joe and the claimant, Joe was the head of the family. Claimant simply moved into the home and took her station there as housewife. Perhaps she was under no duty to cook or render other services for decedent; but she did render them, as to a rightful member of the family, without objection, without any suggestion that she be paid for them, or that decedent was under any duty to pay for them. There is no evidence that she performed the services under any promise or expectation of pay. While the evidence is that claimant owned the chickens, and that what she needed for the house was obtained from the proceeds of chickens and eggs, the chickens were raised on the farm, and their food was raised on the farm, though they "were not fed from the old gentleman's grain." During all the years decedent attended to the garden, unless it was the last two, and did considerable farm work. There is some evidence of his helping about the house. The earliest of the statements which are claimed to have been made by decedent was some three years after claimant took her place in the family as housewife, and this statement was that decedent "meant to take care of Effie and see that she was paid for all that she had done for him." This and the other statements made later, as testified to, were expressions of gratitude and appreciation, and, at most, of a purpose to reward claimant. None of the statements can be construed as an admission of the existence of contractual relations or of a legal duty to compensate plaintiff or as the making of a contract for either the past or future. There is no evidence that decedent at any time understood that any contractual relations with claimant, express or implied, existed or were in contemplation by him or by her. His contractual

relations were with the husband Joe alone, and antedated plaintiff's membership in the family. Certainly there was no arrangement for compensation when the farm was first rented to Joe, and afterwards there was no change. A settlement of those relations was made yearly, without any suggestion of any further liability either to Joe or to his wife, or for board or services furnished to him, or for liability to him for services rendered by him to them. The same arrangements that were in existence before plaintiff became a member of the family were continued for 17 years, without any suggestion that plaintiff, in taking her position and rendering the services to decedent, did so in any other capacity than as housewife, serving the members of the family as it was previously constituted and continued with her added membership as the housewife. Her services were meritorious, but they were rendered as by one member of the family to another.

The difference between an express and implied contract is in method of proof. Thompson Yards v. Haakinson & Beaty Co., 209 Iowa 985; Carlson v. Marshalltown, 212 Iowa 373. A meeting of the minds is as essential to an implied as to an express contract. Id.; Hodgson v. Keppel, 211 Iowa 795; Johnson County Sav. Bank v. Creston, 212 Iowa 929.

A promissory expression without intention to contract does not result in a contract. In re Estate of Newson, 206 Iowa 514, 518; Port Huron Mach. Co. v. Wohlers, 207 Iowa 826, 829; Phillips v. Van Schaick & Wilcox, 37 Iowa 229, 236; Slaughter v. McManigal, 138 Iowa 643, 648.

The presumption is that claimant's services were rendered as a member of the family, without right to compensation. The burden of proof was upon her to show the existence of the alleged implied contract for compensation—a mutual expectation or understanding upon the part of the decedent that he was to pay, and upon the part of plaintiff that she was to receive, compensation. In re Estate of Philbrick, 197 Iowa 170; Donovan v. Driscoll, 116 Iowa 339; Wilson v. Else, 204 Iowa 857; Peterson v. Johnson, 205 Iowa 16, 23; Bartholomew v. Adams, 143 Iowa 354.

Appellant further contends that, as claimant had no independent business, and the services were performed in the home as a part of her duties as housewife, her earnings presumptive-

ly belonged to the husband. We express no opinion on this contention. See, however, Lyle v. Gray, 47 Iowa 153; McClintic v. McClintic, 111 Iowa 615; Hamill & Co. v. Henry, 69 Iowa 752; Bartholomew v. Adams, 143 Iowa 354; Carse v. Reticker, 95 Iowa 25; Lindsey v. Lindsey, 116 Iowa 480; Miller v. Dickinson County, 68 Iowa 102; Weeksman v. Powell, 178 Iowa 991; Mewhirter v. Hatten, 42 Iowa 288; Snyder v. Nixon, 188 Iowa 779; Booth v. Backus, 182 Iowa 1319; Tucker v. Anderson, 172 Iowa 277.

Defendant made motion for directed verdict, which for the reasons stated should have been sustained.—Reversed.

All Justices concur.