HARVEY SINIFT et al., Appellees, v. NAN B. SINIFT, Appellant.

No. 44325.

FEBRUARY 7, 1939.

OPINION ON REHEARING SEPTEMBER 24, 1940.

REHEARING DENIED JANUARY 17, 1941.

O. M. Slaymaker, R. E. Killmar, and D. D. Slaymaker, for appellant.

G. C. Stuart and A. V. Hass, for appellees.

Truman S. Stevens and W. W. Bulman, amici curiae.

H. J. Melton and D. M. Kelleher, amici curiae.

BLISS, J.—This cause was submitted on rehearing from an opinion and judgment reported in 284 N. W. 91. In addition to the arguments on the original submission, we have presented to us several hundred pages of additional argument on the petition for rehearing and on the resubmission, including arguments by able amici curiae on behalf of the appellees. We have reaffirmed our conclusion as set out in the first opinion but substitute this opinion in its stead.

John Sinift, sometimes referred to as John W. Sinift, at the age of about 78 years, died testate in Warren county, on March 29, 1935, leaving the defendant, Nan B. Sinift, about 3 years his junior in age, as his surviving widow. No children were born of this marriage. The plaintiffs, Harvey Sinift, Ellsworth Sinift and Hettie Moore, are the brothers and sister, and Belle Tull is a niece, of the testator. They are his only heirs. The testator executed his will on March 29, 1932, and it was probated in the district court of Warren county on April 29, 1935. Norman F. Baker, a banker, friend, and business adviser of the testator and his wife, drew the will, and qualified as the executor named therein. As such executor, he filed an inventory, listing as the joint property, and assets of the estate, the following property: 525.71 acres of unincumbered farm land, and a small

tract of ground, about 9 rods by 9 rods, owned by the testator and wife jointly; a joint, equal interest with a tenant in certain farm equipment and livestock; a balance of $3,953.35 in the checking account of the testator in the Farmers & Miners Bank of Lucas, Iowa; a book account of $654.72 owing by a partnership of the testator and a tenant; a certificate showing a time deposit at 2-percent interest in the National Bank & Trust Company of Chariton, on December 10, 1934, by "John or Nan Sinift" and payable to them or their assigns, of $16,000; a certificate showing a time deposit at 2 percent in the said Farmers & Miners Bank, on December 10, 1934, by "John Sinift or Nan B. Sinift" of $14,000, payable to the order of "either or survivor"; Lucas county, Iowa, primary road bonds, of the par value of $6,000, in the name of "John Sinift and Nan B. Sinift"; U. S. $3\frac{1}{4}$-percent, Treasury bonds, 1943–45, par value of $2,-200, in the name of "John Sinift or Nan B. Sinift"; U. S. $2\frac{7}{8}$-percent Treasury bonds, 1955–60, par value $6,500, in the name of "John Sinift and Nan B. Sinift or the survivor;" U. S. $4\frac{1}{4}$-percent, 4th Liberty Loan bonds, par value $2,000, in the name of "John Sinift and Nan B. Sinift, or the survivor;" U. S. $4\frac{1}{4}$-percent, 4th Liberty Loan bonds, par value $1,000, in the name of "John Sinift or Nan B. Sinift, or the survivor;" U. S. $4\frac{1}{4}$-percent, 4th Liberty Loan bonds, par value $5,000, in the name of "Nan B. Sinift and John Sinift, or the survivor;" U. S. 3-percent Treasury bonds, 1951–55, par value $7,000, in the name of "John Sinift or Nan B. Sinift, or the survivor;" U. S. 3-percent Treasury bonds, 1946–48, par value $5,000, in the name of "John Sinift or Nan B. Sinift, or survivor;" U. S. 4-percent Treasury bonds, 1944–54, par value $2,000, in the name of "John Sinift and Nan B. Sinift, or the survivor;" and U. S. 4-percent Treasury bonds, 1944–54, par value $6,000, in the name of "John Sinift or Nan B. Sinift, or the survivor." Later he reported the receipt of a dividend of $2,466.24 from the receiver of the Peoples Bank of Lacona, Iowa. The executor listed no debts.

By his will, John Sinift disposed of all of his property of every kind, and directed his executor to pay all debts and obligations of every kind. To his wife he gave absolutely all

household furnishings and stores pertaining to the homestead. He also provided in his will as follows:

"Par. 3.  To my said wife Nan B. Sinift, I give the entire and the whole income of all of my said property during her natural life time.  To be by her kept or used in any manner that she may see fit, excepting only that out of the income of my said property there shall be paid the property tax assessed against the same.

"Par. 4.  I give and devise to my said wife Nan B. Sinift, full power of management and control of my entire estate, to invest and reinvest the same, and to vary the securities and other personal property belonging to my estate or which from time to time may be acquired, and I further authorize and empower my said wife Nan B. Sinift to sell, transfer and convey any of my said securities or other personal property for the purpose of reinvestment.

"Par. 5.  I direct that no part of my real estate be sold during the life of my said wife.

"Par. 6.  At the time of the death of my said wife Nan B. Sinift, my property shall then be divided, as follows: One half of the same to the estate of my said wife Nan B. Sinift, and the other one-half to my legal heirs."

There is no controversy in this suit over any of the property inventoried, except the road bonds, the government bonds, and the two certificates of deposit.  In their petition the plaintiffs allege the matters of fact set out above, and aver that it was the intention of the testator that upon the death of the defendant the plaintiffs should be entitled to one half of the property inventoried or to which it had been changed, but that the defendant is claiming absolutely, in her own right, and not under the will, the government bonds, the certificates of deposits and one half of the road bonds.

The plaintiffs pray that the court decree that all of the property inventoried is the property of the estate, and that the defendant holds no part of it as absolute owner, but only as a trustee during her life, for the plaintiffs and the heirs or estate of the defendant, and that the court decree that John Sinift was the absolute owner of all of the property at the time of his death,

and that it is part of the assets of his estate to be disposed of in accordance with the terms of the will.

By her answer and amendments thereto, the defendant admits the relationship of the parties, and the execution and probate of the will. She then denies generally, and alleges: That the government bonds and certificates of deposit are her property and that she had the possession, control and ownership thereof prior to her husband's death; that none of these securities had ever been in the possession or control of the executor or of the estate; that the decedent and defendant had together accumulated the money which purchased this personal property, and that they had agreed that the securities should be made payable as designated therein and should belong to the survivor; that, as they had agreed, the securities as bought were delivered to the defendant and that she at all times after their issue, and at the death of the testator, had possession of them and thereby became their owner; that the road bonds were owned jointly and equally by the defendant and her husband and that after his death these bonds were sold, and by settlement with the executor, the estate and the defendant each accepted one half of the proceeds; that money acquired by the joint labors of the testator and defendant purchased all of the bonds and certificates which became their joint property; that the procurement of this property was the consummation of a verbal trust agreement that the survivor was to have and own the property; that the testator and defendant owned the property as joint tenants; that the government bonds are three-party contracts between the government, decedent, and defendant, under the terms of which the defendant as the survivor of the two payees became their owner; that the government has recognized its contractual obligation by exchanging the old bonds for new bonds payable to defendant; that the two certificates of deposit are contracts between the respective banks and the decedent and defendant, that in the event of the death of either payee the deposits were payable to the survivor, which obligation has been performed by the banks; and that as to all of the property described in the petition, other than the government bonds, road bonds and certificates of deposit, the defendant disclaims any interest or ownership. The only other property described in the petition was the checking-account balance, the

partnership account, and the farm equipment and livestock. The foregoing is a statement of defendant's pleaded defenses as epitomized in her resubmission argument. At the conclusion of this statement appellant asserts that this court has given effect to all of these defense theories under a more inclusive rule that the evident intent of the parties must control. We agree that whatever may be the various defense theories, and whatever particular name may be given to each defensive theory, the controlling factor in the decision of this case, is the intent of John Sinift, as established by the entire record, taking into consideration his life and conduct in general, the making of the bank deposits and the purchase of the bonds in the manner shown, the testamentary disposition of his property, and the conduct of the defendant herself.

In view of the fact that this intent is the polar star by which the court must be guided, and that it is a question of fact, a brief general background statement will be helpful.

John Sinift was born in Wapello county about 1857 and came to Warren county with the family when about 15 years old, and a few years later went West. While there he purchased farm land in Warren county, Iowa. Some of the deeds which he received in 1898 and 1899 state that he was a resident of Carbon county, Wyoming. He returned to Iowa about the latter year. There is some evidence that he had considerable money on his return. Whatever may be the truth about this, it is a fact that, shortly after his return to Iowa, he was the owner of 440 acres of Warren county land, the recited consideration for which was $21,000 including a $4,500 mortgage which he assumed and agreed to pay. The time of the acquisition of another 40 acres is not shown. In February 1900, when he was about 43 years old he married the defendant, whose age was then about 40 years. In 1904 he bought 5.7 acres, and in 1908, 80 acres, paying for both tracts, $1,750. He died possessed of this land, the title and ownership of which always remained in him. Until about 4 months before he died when they moved to the village of Liberty Center, he and his wife lived upon one of the quarter sections. Tenants, under share arrangements, aided him and also farmed the remainder of the lands. The work of both of them was that customary in operating a farm. He and his wife

worked hard and lived frugally. They were industrious and thrifty. He was a money-maker and had the full cooperation of his wife. He bought and raised cattle and hogs for feeding purposes. About 18 years before his death he became afflicted with neuritis and rheumatism, principally in his hips. First he was compelled to walk with a cane, then with two canes, next with a crutch, and for probably the last 15 years of his life, he required two crutches to aid him in arising from a sitting position, and in moving about. In August 1933, he suffered a stroke of paralysis which disabled his left limbs. About 3 weeks before he died he suffered a second stroke. During the last 10 months of his life he was so incapacitated as to be unable to leave the home, except when he was carried to the automobile. He required hired help for his personal care during this time. Just how he transacted his business or in what banks, during the earlier years does not definitely appear, but some records from some of the banks, as early as 1923, and continuing down until after his death were introduced in evidence, and certified to us by the appellant. It appears that during these years the defendant wrote her husband's letters and signed his name to them, and signed his name to all checks on his account, and indorsed his name on all checks, drafts, coupons, bonds and certificates. While he was able to get about they appeared together when deposits were made or bonds were purchased. Each took part in the transactions although one witness said that John usually gave the final instructions. He was a man who had had but little book schooling.

Appellant insists that appellees neither pleaded nor proved that the ownership of the property involved was in John Sinift at the time of his death, and she has discussed at considerable length the source of each item of property. We therefore refer to the facts pertaining to the inception and additions to these securities, and take up first those arising from the deposits in the Peoples State Bank, in the little town of Lacona, a few miles from the Sinift home. The certificate of deposit ledger of this bank was received in evidence and certified to us. This exhibit shows that on March 8, 1923, six certificates of deposit totalling $12,700 were issued to "Nan or John Sinift." Sixteen days later, two of them of $2,000 each were

paid, and what was done with the money does not appear. On September 3, 1923, the remaining certificates of $9,000 were renewed to "John Sinift", and on March 1, 1924, they were again renewed to "Nan B. Sinift or John Sinift." They were renewed on September 1, 1924, in the sum of $10,000 to "John Sinift." A further indication that the manner of the designation of the payees was of little significance to them, appears from the fact that certificate No. 344 for $2,400 was issued to "John Sinift" on October 18, 1924, and certificate No. 421 for $900 was issued to "John or Nan Sinift" on January 22, 1925, and on March 2, 1925, both certificates were combined in certificate No. 457 for $3,300, payable to "John Sinift," alone. On the same day additional certificates totalling $10,000 were issued to "John Sinift". These certificates were renewed and added to about every 6 months thereafter, and always made payable to "John Sinift", alone, until March 15, 1928, when two certificates of $12,000 each were issued to "John Sinift." These two certificates were renewed to "John Sinift" in the total amount of $24,000 until March 22, 1930.

Going back for a moment we find that this bank, on February 14, 1925, issued its certificate of $400 to "Mrs. Nan Sinift" which was renewed to her on September 12, 1925, in the sum of $481.56, and on April 27, 1925, certificate No. 513 was issued to "Nan B. Sinift, Admx.," for $653.68, which was included in a certificate issued on December 28, 1925, to "Mrs. Nan B. Sinift" for $1,290.70, which was renewed and added to until March 22, 1930, when a certificate for $2,725 was issued to "Nan B. Sinift." She withdrew this deposit with interest on June 10, 1930. The bank closed on August 23, 1930, in possession of the time deposit of $24,000 of John Sinift and a balance in his checking account of $262.39. Adding $400 interest on his certificates made the claim which he filed against the receivership, $24,662.39. On October 23, 1928, he opened a checking account in the Farmers & Miners Bank of Lucas, Iowa, a private bank. On February 21, 1931, he received a 30-percent dividend check of $7,358.72 from the receiver of the Lacona Bank, which he took to the Lucas bank for a time deposit, but the banker, Baker, told him he had too much on deposit already, and for him to buy bonds. The check was

deposited in his checking account, and on March 20, 1931, and April 29, 1931, by checks of $1,056.61 and $5,168.30 respectively, the Lucas county primary road bonds of $6,000, inventoried, were purchased. On January 4, 1932, he received a second dividend from this receiver—a 15-percent dividend of $3,699.36—which was deposited in his checking account on January 8, 1932. John Sinift signed a receipt for the first dividend, reciting that it covered dividend "on my claim against said bank * * * and I also represent that I am the owner of the said dividend and claim at this time and that the same has not been transferred or assigned by me * * *". The defendant signed the name of her husband to the receipt for the second dividend, which contained identical representations. In seeking to show that the second dividend of $3,699.36, on this deposit claim of John Sinift in the receivership, did not go into any of the securities in controversy, appellant argues that this check was deposited in John Sinift's account on January 8, 1932, and on January 13, 1932, a check was drawn for $3,116.25, to buy Linn county primary road bonds, which her counsel say are not involved in this litigation. This inference does not follow. Evidently the counsel overlooked an entry, on the deposit side of this ledger sheet, of July 10, 1933, of $3,010.87, from the sale of Linn county primary road bonds, and that on the same day a check was drawn on this account for $1,620 to purchase a U. S. Treasury, 4-percent, 1944–54 bond, and on December 13, 1933, a check for $1,039.36 for a like bond, and on April 19, 1934, a check for $2,018.96 was drawn for a 3-percent 1951–55 U. S. Treasury [bond], all of which are among the bonds in controversy.

Counsel also argues that this $24,000 was in fact not his entirely, for he states: "A significant reason for John to maintain the $24,000 in this bank in his own name was that he was a stockholder in that bank." We see little point to the conclusion if the premise were true, but there is some question about it. Baker testified that he was, but Mr. Grogan, an examiner in charge of the closed bank, and who would have particular reason for knowing, said that he did not think he was a stockholder. The defendant was not asked about the matter. Counsel also states that the record does not show

what Sinift's stock assessment was. This is true. It is also true that there is nothing in the record showing there was a stock assessment. All this argument on the part of the appellant is to convey the idea that John Sinift had little money when he was married or lost it shortly afterward, and all he had when he died was due largely to the labor and economy of the defendant. There is some evidence that he had $60,000 when he returned from the West, but what he had or what he lost is almost entirely in the field of rumor, and has so little worthy evidence to support it that we have disregarded both matters. But it is also immaterial. Whatever estate any husband leaves, whether he be farmer, laborer, business or professional man, is usually larger because of the labor and the thrift of a good wife, but unless all or any part of it is hers by executed gift or lawful contract, her share therein is limited to what his testamentary disposition, or the statutes, give to her. A third and final 10-percent dividend check of $2,466.24 was paid to the executor and went into the funds of the estate on October 15, 1936. That accounts in full for his Lacona bank deposits.

The $16,000 certificate of deposit in the National Bank & Trust Co. of Chariton, inventoried by the executor, was a renewal of a certificate of the same amount dated June 11, 1934, when he was confined to his home, which recited that "John or Nan Sinift or the survivor has deposited in this bank $16,000 payable in current funds on the return of this certificate properly endorsed * * *". In considering the claim of defendant that she and her husband had agreed that the survivor was to become the owner of these securities, it is significant that the defendant personally presented this certificate for renewal on December 10, 1934, at a time when her husband could not be with her because of his physical disability, and she had it drawn to state that the bank "received from John or Nan Sinift sixteen thousand dollars * * * payable in current funds to said depositor or *their* assigns * * *", without mention of survivorship. With reference to this renewal, appellant in her resubmission argument (page 93) states:

"Appellees' witness Gookin testified that there had been a mistake in writing the payee clause in the final certificate."

No page or line of the abstract is given as reference. We have searched the abstract and the transcript relative to Mr. Gookin's testimony and find nothing to support this statement. Appellant also intimates that since Mr. Hass, assistant cashier, is the father of one of appellees' attorneys, he might have given some information on the matter. So might the defendant, but as a witness she was never asked. On the same day, December 10, 1934, the defendant, personally presented for renewal to the Farmers & Miners Bank its certificate of deposit for $14,000, and it was renewed for that amount. Mr. Baker testified that on this occasion he observed that the defendant had in her possession the $16,000 certificate in controversy. With respect to the defendant's claim that she owned all of these securities by virtue of a gift inter vivos, it is also significant to note that, as noted on the surrendered $16,000 certificate, the accrued interest on December 10, 1934, for 6 months was $160, and as noted on the surrendered $14,000 certificate, the interest for the same time and same rate was $140, and on the ledger sheet of John Sinift's checking account in the Baker bank, on December 10, 1934, appears a deposit of *$300,* and no deposit of any amount within months of that date appears on the ledger sheet of her checking account in that bank, and there is no evidence that she had a checking account in any other bank. She collected the interest of $300 that day, and it is a fair inference that she made the $300 deposit that day. After the death of her husband, the defendant withdrew $10,000 of the $16,000 certificate in the National Bank & Trust Company and bought herself an annuity in the John Hancock Insurance Company, and left the balance on deposit.

The $14,000 certificate of deposit, above mentioned, started with a time deposit on November 5, 1927, for $3,800, from the sale of cattle, and by renewals thereafter in the respective sums of $4,000, $7,000, $8,000, $9,500, $11,500, and $12,000 reached the sum of $14,000 on December 9, 1931. It was renewed at that figure every 6 months thereafter until the last renewal on December 10, 1934. That certificate recited that "John Sinift or Nan B. Sinift had deposited $14,000 payable to the order of either or survivor." After her husband's death, the defendant, on June 10, 1935, had it transferred to her checking ac-

count in the same bank, which account had no balance in it except the $135 which she had received as interest on the Lucas county road bonds, on May 8, 1935, and thereafter she checked on this account for $4,500 to buy a dwelling in Chariton and a furnace, for $5,145.83 for a Federal Farm Mortgage bond, for $4,062.64 for U. S. Treasury 2⅞-percent 1955–60, bond, and for $1,020 for a U. S. Treasury 2¾-percent, 1951–54, bond. At the time of the trial Baker had a list (Exhibit P-2) of the government bonds, then on hand, identifying each, and totaling $41,700. The Federal Farm Mortgage bond, above referred to, purchased on September 19, 1935, was not included in that list, and this bond is unaccounted for in the record, unless it is the bond which was sold on October 10, 1935, for $5,185.42 and deposited on the same day to meet the check of $5,000 drawn that day to the estate.

John Sinift had also been a patron of the State Savings Bank of Chariton for several years, to the extent of having time deposits therein. On December 14, 1932, this bank issued a certificate of deposit stating that "N. B. or John Sinift has deposited in this bank payable to the order of either or the survivor $16,000 * * *". The witness from the bank did not know how the previous certificates had been made payable. This bank went under restrictions about January 31, 1933, and opened under reorganization as the First State Bank, on June 27, 1934, at which time 50 percent of the old deposit claims, with interest to the time of restriction, were paid. On July 3, 1934, Bates, as receiver, issued on the Sinift deposit claim, his check for $8,040.89. To whom it was payable is not clear in the record, but in our judgment this is not material. This was at a time when John Sinift was confined to his home. Under date of July 5, 1934, the ledger sheet of the defendant's checking account in the Baker bank, which account had no balance on that date, is shown a credit deposit of $8,040.89. On September 6, 1934, the defendant checked upon that account in the sum of $3,086.25 for the purchase of a $3,000 U. S. Treasury 3-percent, 1946–48, bond, and with another check upon the account for $3,036.94, on November 10, 1934, she purchased a $3,000 U. S. Treasury, 3-percent, 1951–55, bond, which left a balance in her account on that day of $1,922.70.

On January 25, 1935, the defendant transferred this balance to the checking account of her husband in the same bank. It is not clear whether either of these bonds was included in the inventory. The next and only payment on the deposit claim against the State Savings Bank or its successor, was 10 percent of the unpaid 50 percent, or $804.09, which the defendant received, and which was deposited in her checking account in the Baker bank on July 25, 1936.

John Sinift began buying bonds about the time Fourth Liberty Loan bonds were first sold. The earliest paper evidence of such purchase comes from the records of the Chariton & Lucas County National Bank, which was later apparently the National Bank & Trust Company. These records show that the first-named bank on March 8, 1923, received from "John or Nan B. Sinift" three $100, and two $1,000 bonds of this issue, and on November 23, 1927, the same bank received from "John Sinift and Nan B. Sinift or the survivor" two $5,000 bonds of this issue. All of these bonds were received for safe-keeping. John Sinift signed a receipt for all of them on December 14, 1932, but did not take them, but directed the bank to deliver them to Baker or his bank, and the latter receipted for them on March 20, 1932. It is of some significance that on December 14, 1932, it was John Sinift who receipted for these bonds, and it was John Sinift, who decided to change the depositary of those bonds from the National Bank & Trust Company to the Farmers & Miners Bank. He had executed his will in the preceding March, at which time appellant contends they were not included in the will because they were not his property. And yet we find him exercising dominion over them 9 months afterward.

With the exception of the $12,300 Liberty Loan bonds just referred to, all other bonds, either road or government, which are involved in this suit, were purchased through the Farmers & Miners Bank. With the exception of two bonds all of the bond purchases were by checks upon the account of John Sinift in this bank, commencing on June 8, 1929, and terminating on June 11, 1934. As heretofore stated $6,000 of U. S. Treasury bonds were purchased by checks upon the account of Nan Sinift, but from the deposit therein of the $8,040.89 dividend check

on Sinift's deposit in the State Savings Bank. The only bond paid for by the defendant was a U. S. Treasury, 3-percent, 1951–55, $1,000 bond, purchased on June 11, 1934, by check on her account. On the same day Sinift bought an identical bond, by check on his own account.

In addition to the said bond which defendant paid for, she also made other investments. We have already referred to the time deposits in the Lacona bank, from which she withdrew $2,725 and accrued interest on June 10, 1930. During the time that John Sinift was making time deposits in the Baker bank in the name of himself and defendant, she was making time deposits therein payable to herself, alone. Her first certificate on October 24, 1927, was for $1,070. It was renewed 16 times in respective amounts of $1,752.61, $2,327.62, $3,000 (12-24-1929), $6,000 (6-9-1930), $6,331, $6,457.62 (12-9-1931), $6,586, $6,769, $6,214.44, $6,338.73, $6,578.81, $6,644.59 (12-10-1934), $6,711.03, $6,900, $6,969, and $7,925.69 on June 9, 1937. With respect to the $2,725 which defendant drew from the Lacona bank on June 10, 1930, counsel for her argue:

"Appellees did not attempt to show where that went. Her checking account, Exhibit D-5 (Abst. p. 111, lines 23 et seq., see also, certified exhibit) did not receive it, and neither does her C. D. account, Exhibit P-3, show any material increase at or after that date. It is a reasonable inference to assume that this money that had stood in Nan's name went to buy some of the joint securities here in controversy."

The statement in the last sentence is the purest surmise, without the slightest basis in the record. The defendant must have known about this, but her counsel never interrogated her. It will be observed from the record of the renewals of her certificate of deposit, set out just above, that the amount of the certificate jumped from $3,000 on December 14, 1929, to $6,000 on *June 9, 1930*. The bookkeeping record of the withdrawal of $2,725 was on *June 10, 1930*. It is conceded that no part of this money went into any of the securities or deposits involved herein, or into John Sinift's property. It is claimed by the defendant that it was the intention of herself and husband that the survivor should get the property, and that it was held in joint tenancy,

but apparently such claimed arrangement had no application to *her* individual property. By testimony and argument counsel for appellant has sought to show that her property went to build up her husband's assets, but the record does not support it. The defendant could have definitely disposed of this matter, but no inquiry was made of her upon the witness stand.

In support of the appellant's contention that the securities are hers because of the completed gift of them at divers times to her by her husband, her counsel by examination and argument has sought to show that she at all times prior to the death of her husband had complete possession and control of these securities. With respect to the bonds there is no basis for such claim. The defendant never had such control or posesssion of them. The bonds were at all times in the possession of banks for safekeeping. Sinift delivered the $12,300 bonds to the Chariton bank where they were kept for almost 10 years until he directed their delivery to the Baker bank, which at all times had possession of the other bonds. This bank then deposited all of the bonds in a Des Moines bank, where they remained until Sinift's death.

The defendant did have possession of the certificates of deposit, at times. But what was the character of that possession and the reason for it? Sinift's physical condition for almost 20 years greatly hampered his movements. From August 1933, the left side of his body was paralyzed. The last 10 months of his life he had to be carried about. When they went to the bank it was of course the wife who was up and around the counter. She delivered the old certificate and received the new one and put it in her handbag and carried it home, and placed it where they kept them. This was repeated every time a deposit or renewal was made. No one can seriously contend that such possession was the consummation of a gift. She also made the deposits in his checking account, when the checks were not mailed, but she never claimed that account was hers. On the day of his death there was a balance in that account of $3,966.11, but she never claimed it and does not now, though she wrote every check on the account. The certificates were as much in his possession as in hers and the banks would have paid them to either, but under this record

that does not mean that the proceeds would have been hers, or that there was any three-party contract to that effect.

Another defense is that the defendant helped earn the money which went into these securities, and in fact did more than he, and that these services were extra-marital, and that they were thereby wholly or partly hers as a matter of right, or that he gave them to her because of her services. In addition to the defenses of gift and other defenses pleaded in her answer in which the defendant claims all of the property in controversy, she repeatedly insists in argument that she is without question entitled to at least one half of this property, upon the unpleaded claim that she earned it by her services on the farm of her husband for which he agreed to compensate her. The work which she performed was not different from that performed at times by perhaps most farm wives. This is evident from her own testimony. She testified:

"From the time I married Mr. Sinift I followed the work of farming and raising stock. I did everything any woman could do, worked in the field and garden and raised chickens and did the housework and everything that way. I had very little help. I continued to do that up to the time we went to Liberty Center. I worked in the field whenever it was necessary. Continued to feed the cattle and the stock. * * * I don't know how anybody could be more saving than I was. Tried to raise everything and canned everything I could. My husband was just as saving as he could be. I think I did my full share to earn what we have. Yes, I did more than my share I say."

She may have done more than her share. But it is no more than the wives of most farmers have done. They usually do more than their share. If this work was extra-marital, evidence of its extent is too indefinite. Neither is there any evidence, admissible or inadmissible of a contract, or of its definite terms, by which her husband was to compensate her for it. The extent of the evidence on this matter is her testimony:

"I say those certificates belonged to me after my husband's death. I think if they did not belong to me I don't know who they belonged to. *They belonged to me under an arrangement me and my husband made.*" (Italics ours.)

She has not established this defense. See Bohanan v. Maxwell, 190 Iowa 1308, 181 N. W. 683, 14 A. L. R. 1004; Reid v. Reid, 216 Iowa 882, 249 N. W. 387; Mewhirter v. Hatten, 42 Iowa 288, 20 Am. Rep. 618; Miller v. Miller, 78 Iowa 177, 35 N. W. 464, 42 N. W. 641, 16 Am. St. Rep. 431; In re Estate of Straka, 224 Iowa 109, 275 N. W. 490; Hamill & Co. v. Henry, 69 Iowa 752, 28 N. W. 32; In re Estate of Unangst, 213 Iowa 1064, 1070, 240 N. W. 618. There is no evidence of a partnership agreement, for valuable consideration, nor of any agreement to pool their separate properties or their individual labors in a common enterprise or business, in which all of the property or any specified percentage should go to the survivor, as exemplified in the cases of Stewart v. Todd, 190 Iowa 283, 173 N. W. 619, 180 N. W. 146, 20 A. L. R. 1272; Mueller v. Batcheler, 131 Iowa 650, 109 N. W. 186; and Stonewall v. Danielson, 204 Iowa 1367, 217 N. W. 456.

We have already referred to the industry and thrift of each of them. His physical condition added greatly to her burdens and also to her duties. Because of his disabilities her services were harder and even different than they would otherwise have been, but they were not extra-marital, or such as to entitle her as a matter of right to the income and increment of his business. He had owned and paid for most of the land when he married her. There is no evidence that she put any money she may have had into the land or equipment. The title at all times was in him. The products of the property were his. The deposits in his bank accounts were wholly from the earnings of his farm operations and interest on his investments. Every security or investment in controversy was paid for in full from money acquired in the operation of his farm land and equipment. He had the right to give it all to her, but did he give it to her or did it become hers in any of the various ways which she alleges?

It is true that the circumstances before and after, and at the times of the execution, receipt or delivery of instruments of the character, or with the provisions of those involved herein, may be such as to indicate the actor's purpose to pass the property to the one claiming it under the instruments. But the fact that the instruments are so worded may not be conclusive

of such fact, and may even be but slight evidence of it. The determinative fact in this case is what was the intent of John Sinift respecting the ownership and disposition of this property. There is direct evidence that the bonds and certificates were made payable as they were so that the survivor would get the property. Such is the testimony of Baker and of the defendant. Much of their testimony is not convincing. The defendant, in her answer and amendments thereto, had alleged that she had cashed the two certificates of deposit inventoried and no longer had the same, and that she had cashed a large number of the government bonds and had used the money. She and Baker were the only persons who could give definite information on these matters. The plaintiffs were compelled to use them as witnesses. They were hostile to the cause of the plaintiffs. The information obtained from the defendant was of little help to the plaintiffs, as the following examination discloses:

"Q. In the answer filed for you in this case Mrs. Sinift it is stated here that certain primary road bonds referred to in the petition we have filed have been sold and that you received one half of the money, is that correct? A. I haven't got it here, never have had it in my possession. If I received $3,000 from road bonds Mr. Baker has it. It was never given to me it was left with all the rest."

Baker was also very hazy about this matter. He testified that this money went into her checking account and was used to buy more bonds or for other purposes. Her checking-account record disclosed that this was not true. His testimony was then that it may have been used as a part of the $5,000 loaned to the estate. All of the $5,000, in fact, came from the sale of a government bond. Later the defendant testified she loaned all of the $3,000 to her half brother. Continuing her direct examination the defendant testified:

"Q. Now after your husband died were some of those bonds sent in by you at your direction and changed to other bonds, that were made in your name. A. *Did you Mr. Baker? Did you change any of them? He says he don't have to say anything,* but that is the way I understand it."

We have already set out what the record of her bank account shows became of the $14,000 certificate of deposit, but in answer to plaintiffs' attorney she testified:

"I do not know what I did with the $14,000 certificate in the Farmers & Miners Bank in Lucas. I didn't use it. I expect I cashed it. Mr. Baker probably cashed it if it was cashed. I don't know where the money went. Mr. Baker had a lot of expenses to pay. I never took a new certificate and so far as I know the $14,000 is still in the Farmers & Miners Bank at Lucas."

Mr. Baker was a very willing witness for defendant. The parties agreed that all testimony would be received subject to every legal objection, without the making of any objection.

The attorney for defendant went far afield in his alleged cross-examination and went into every element of the defendant's case. Much of this testimony was subject to objection. The witness was invariably ready to confirm every suggested answer. Leading questions are proper on cross-examination, but the eliciting of testimony in this manner from a friendly witness on vital issues, as was done here, detracts greatly from the weight and value of such testimony. In her argument repeated references are made to Baker, as "appellees' witness". This was true only in the sense that plaintiffs put him on the stand, but not in reality. In their amended abstract appellees complained that the narrative statement of Baker's cross-examination in the abstract made it impossible to get the true and real effect of his testimony, and portions of it were set out by question and answer. Appellant denied the correctness of this statement, and that the exhibits were not fully and correctly set out, and certified to this court the records below, the transcript, and the exhibits. It would have been a tedious task to have abstracted the bank ledger sheets. Throughout the submission the attorneys for appellant in their argument have persistently stated that her personal funds, both $3,000 which they claimed she had at her marriage, and $7,000 or $8,000 which she later inherited, passed into these securities. Having found no competent testimony in the abstracted record

to sustain any such claims, we have checked the certified records and found nothing to support such statements of counsel. The persistence of appellant's attorneys in the way of suggestions to Baker is further shown by these typical interrogations:

"Q. Has he told you repeatedly she did just as much about earning that money * * *? A. I don't know as he told me that.

"Q. Well, in substance? A. In substance I don't remember whether he ever told me, but I guess maybe he thought it.

"Q. In substance hasn't he told you that. A. I don't remember him ever telling me that."

Baker had gone to the Sinift home to receive instructions relative to drawing the will and a few days later returned and presented it for execution. On cross-examination this interrogation took place:

"Q. Was their intention in making that will to include in that estate any of these bonds and certificates of deposit? In other words, did that will so far as you understand apply to that? A. No mention made of the bonds."

Later in the trial, and still on cross-examination, the questions and answers were as follows:

"Q. You explained to him at the time that the will didn't control the disposition of these bonds and the C. D's. that were made payable to the two of them? A. I think that was understood. I don't know as to whether I explained it to him.

"Q. Didn't you there at that time say * * *? A. Yes, possibly.

"Q. * * * this will doesn't control those bonds made to you and your wife or your survivor, and the C. D's. don't come under the will? A. I assume I mentioned it. I knew they were * * *.

"Q. You mentioned that at that time? A. I presume I did.

"Q. You understood he understood that? A. I presume I did."

Later and as the witness was dismissed by the attorneys, the court inquired:

"Mr. Baker, when you were out there drawing that will, or getting it executed, was there or was there not anything said about these bonds and certificates of deposit? A. No mention of them made at all."

In determining the question of intent in this case much weight must be given to the will of John Sinift. The record discloses no immediate emergency for its execution. In their business transactions he and his wife usually participated. Baker testified that in his files he had 500 letters from Sinift, and his wife wrote all of them. They very likely had given much consideration and conversation to this testamentary disposition. Baker had been called out to their home to receive directions as to how the will was to be drawn, and after a few days he returned with the will for execution. The record shows that at that time Sinift had cash on hand and securities approximating the value of $75,000. The will disposed of all of his property, both real and personal. It gave the income of all of his property to the defendant during her life. It gave to her the full management and control of his entire estate, "to invest and reinvest the same and vary the *securities* and other personal property, * * * and to sell *said securities* * * * for reinvestment." (Italics ours.) He forbade the sale of the real estate, so that the property involved in the trusteeship for reinvestment was almost wholly limited to the "securities". If the contention and claim of the appellant is correct, and the bonds and certificates were not to be disposed of by the will, there would have been no securities, and but little personal property for investment or reinvestment. What little other available personal property would have been consumed in the payment of obligations and estate expenses. And that is just what happened. The estate has been administered in conformity to defendant's claims. And the record shows that the executor had to borrow $5,000 from the defendant, by a check on her account, on October 10, 1936. It was borrowed to pay taxes and administration expenses. On the same day a deposit of $5,185.45 was made to pay the check, and the funds

came from the sale of a bond. The bond must have belonged to the estate because she had bought but one bond—a $1,000 bond —with her own money. And yet Baker, the executor, testified that the estate owed the defendant $5,000 on this transaction. Is it reasonable to suppose that John Sinift would have provided for the investment and reinvestment of his securities until the death of his wife, had he thought that his securities would not be sufficient, even, to meet the administration expenses? The question answers itself. Substantially all of the securities which he then had belonged to the defendant at that time, according to her present contention, and are now claimed by her. He had very likely some farm equipment and stock. In addition, he had a balance in his checking account, on the day he executed his will, of $2,272.86. He had nothing further in the nature of a security or other personal property but a balance on an unpaid claim against the defunct bank at Lacona. After his death a final 10-percent dividend of $2,466.24 on this claim was paid to his estate, but is it reasonable to suppose that he would attempt to establish a trust fund on the prospects of realizing on that indefinite claim? It seems clear to us that the testator at the time he executed the will had no question in his mind as to his ownership of all of the bonds and certificates of deposit, and claimed them all and included them in the property disposed of by the will. The defendant was present when the will was executed and she must have known of its provisions. If she then thought that the securities were hers, the matter of whether the will disposed of them would hardly have been passed without comment or question. The fact that there was no such comment convinces us that her intentions coincided fully and identically with his.

Another matter which supports our conclusion is the fact that in the disposition of his property he would very naturally recognize the claims which his relatives had upon his bounty. Neither he nor his wife had any but collateral relatives. He had two brothers, a sister and an incompetent niece of a deceased sister. His living sister was in such financial circumstances that she was receiving pension relief at the time of the trial. His wife's only relatives were three half brothers. Under the will both sets of heirs received the same generous recog-

nition, but, if the defendant's contention is true, the heirs of her husband would be subjected to the hazard of receiving a much lesser share of his estate.

■ Further confirmation of our conclusion is furnished by the attitude of defendant toward the John Sinift checking account. Baker said it was really a joint account, and some letters written by the defendant, but signed in her husband's name, refer to it as "their account." Baker at the suggestion of appellant's counsel, readily said the defendant's butter, chicken, egg and cream money went into that account, but on redirect examination he said he knew nothing about it. She was not asked about it. She also had her own checking account in the same bank. If it were a joint account she might have been inclined to claim half of it on her husband's death, under counsel's theory that she had earned more than half of it, but she did no such thing. Although she makes no claim to these funds, her counsel states:

"The inevitable conclusion from the record is that the funds in this checking account were common funds and that Nan owned an equal share therein. It is our further claim that her interest in those funds was not the result of a gift. We claim that she earned her share in these funds."

He seeks to justify her failure to claim them on the ground that the checking account was but a temporary arrangement for their convenience, and the funds therein, as he expresses it, had not been "crystallized" into any of the forms of the multiple defense. We agree that it was handled in a way to suit their convenience as he had instructed the bank to let her make withdrawals. Indeed, we think the whole manner in which his funds were handled and invested and made payable was for the convenience of both, only, and not for the purpose of unreservedly or irrevocably establishing or vesting absolute ownership, either in praesenti or in futuro, in the defendant. Speaking of "crystallization" it appears that $16,000 was doubly so treated by being deposited payable to either or the survivor in the State Savings Bank, and the dividend check thereon was deposited in the checking account of the defendant, and $6,000 of bonds, so payable, were purchased, but she

transferred the balance of $1,922.70, almost sufficient to buy another $2,000 bond, to the account of her husband, on January 25, 1935, and it was included in the balance in his account at his death. The ''crystallization'' theory does not account for her claiming the bonds, but disclaiming both the $1,922.70, which came from the same source, and the balance in the account. It is but further proof that the time deposits and the bond purchases were so made solely as a matter of convenience, as above stated. After Sinift's death, the defendant appropriated the final dividend of $804.09, from this same deposit claim, and deposited it in her own account where it remains. Just why one check should go to her and the other check to the estate is not explained.

There is a somewhat similar situation with respect to the Lucas county road bonds. These bonds, costing $6,224.81, were purchased from a dividend check of $7,398.72 on his personal deposit in the Lacona bank. The balance of $1,173.91 remained in his account to be used with the second dividend of $3,699.36 from the same source to help buy other securities which are in controversy. The defendant, with little consistency, claims all of the latter, but only half of the road bonds. The last dividend from this source, amounting to $2,466.24, the defendant directed to be paid to the executor of the estate, and claimed no part thereof.

In his resubmission argument (page 146) her counsel states: ''The Lucas county road bonds were *intentionally* purchased for John and Nan as *tenants in common*''. (Italics are ours.) Why were these particular bonds ''intentionally'' purchased for tenancy in common, while all of the other securities involved, were acquired, as appellant says, in joint tenancy. The record does not establish that the road bonds were ''intentionally'' purchased for tenancy in common. In fact it clearly establishes just the contrary, as appears from the following testimony of Baker on cross-examination:

''Mr. and Mrs. Sinift ordered them when they were bought. I bought them for them. *They directed me to have them made out just like the Government bonds, John Sinift or Nan Sinift or the survivor.* They were not made out that way because the County Treasurer said they had no provision in his office

or rule that they could make them out that way, and that he would make them out John Sinift *or* Nan Sinift.''

Just how or why they were made out John Sinift *and* Nan Sinift does not appear. Neither these bonds nor the government bonds, nor copies of either, were introduced in evidence, so that their exact wording was not shown. It is clear from the entire record that the words ''and'' and ''or'', in all of the bonds were used indiscriminately and without definite distinction or purpose.

Appellant's counsel in argument on the original submission stated that the executor and his attorney had agreed that the road bonds ''were held by the decedent and appellant as tenants in common and they were divided as such * * *.'' Continuing, counsel further stated:

''In the light of the same legal experience and knowledge, the executor and attorney had concluded that all of the other securities involved in this action had been owned by their decedent and the appellant as joint tenants with full right of survivorship in the appellant. They had recognized her ownership as survivor, had turned all of the securities over to her and the Probate Court of Warren County, Iowa, had approved their decision and action in this regard.''

With the exception of the statement that the road bonds were divided, there is nothing in the record to sustain any part of the quoted statement.

Appellant also contends that plaintiffs did not state a cause of action, since the petition does not expressly allege that John Sinift owned this property at his death. We think this fact is sufficiently pleaded, and also set out in the prayer. This objection was not raised in any way and the case was tried on the theory that decedent did die seized of the property, and that defendant denied this and claimed it as hers.

Appellant also contends, with respect to the two certificates of deposit, that, under the provisions of Code section 9267, she, as the survivor, became the absolute owner of the money deposited, either on the theory of a triple contract between her husband and the respective banks and herself, or by virtue of the very terms of the section. The section provides:

"Deposit in names of two persons. When a deposit shall hereafter be made in any bank or trust company in the names of two persons, payable to either, or payable to either or the survivor, such deposit, or any part thereof, or interest or dividend thereon, may be paid to either of said persons whether the other be living or not, and the receipt or acquittance of the person so paid shall be a valid and sufficient release and discharge to the bank, banker, or trust company for any payment so made."

This section adds nothing to the words of the certificates that in any way aids the appellant in this action. The legal relationships created by the establishment of joint bank deposits have long perplexed the banks, the depositors and the courts. The banks, in particular, were in a continuous quandary, since until the rights of depositors were determined they could not be certain to whom the account might be safely paid. To remedy the situation many of the states passed statutes substantially identical in import with section 9267. Volume 45 of the Banking Law Journal, 733, 813, 897 (1928) sets out the legislative enactments of many of the states, as of that date, covering this matter. But, as stated in an article in the Cornell Law Quarterly, Volume 15, pages 96 et seq., "these statutes did not settle the rights of the depositors among themselves." It is only when there is no evidence as to intent, that the form of the deposit becomes a determining factor. That such legislation was enacted for the protection of banks with respect to the payment of the funds, and does not affect their title to the deposit, or determine the legal rights of the parties thereto as between themselves, clearly appears from the following holdings from different courts. In Clark v. Bridges, 163 Ga. 542, 546, 136 S. E. 444, 446, the court said:

"It does not affect the right of the property as between the parties; that is, between the depositor and the third person claiming the deposit. It has no applicability to the title to the money as between the depositor and the third party."

The Mississippi court in Godwin v. Godwin, 141 Miss. 633, 639, 107 So. 13, 14, said:

"Its main purpose was to provide for the release and discharge of a bank by the payment of a fund to the survivor of joint deposits of funds in bank, and makes no effort to amend, alter, or change in any manner the laws of descent and distribution."

In Rice v. Bennington County Sav. Bank, 93 Vt. 493, 503, 108 A. 708, 712, that court said:

"The provisions of G. L. 5376 are for the protection of the bank paying money to persons named in deposits made in the manner specified in the statute, and do not change or affect the title to such deposit."

After speaking of alternative deposits, and regardless of whether the fund was claimed as a gift, under a declaration of trust, or as a contract, and stating that in any such case the intent of the depositor was largely determinative of the actual ownership, the Wisconsin court, (Marshall & Ilsley Bank v. Voigt, 214 Wis. 27, 252 N. W. 355, 357), in referring to section 221.45 of the statute, said:

"[It] * * * does not alter the law as stated above or aid in determining whether there has been a completed gift or transfer; * * * The purpose and effect of that statute are to render legally effective receipts or acquittances given to a bank upon its payment of a deposit to either of the persons to whom an account was made payable, regardless of the actual legal rights of such persons, as between themselves, to such deposits."

The New Hampshire court, in New Hampshire Sav. Bank v. McMullen, 88 N. H. 123, 126, 185 A. 158, 161, states:

"The purpose of P. L., c. 261, S. 28, is to protect savings banks and not to determine the rights of depositors and those claiming under them. Dover & C. Bank v. Tobin, supra, [86 N. H. 209] 211, [166 A. 247]."

In Gordon v. Toler, 83 N. J. Eq. 25, 28, 89 A. 1020, 1021, with reference to a savings account, payable to the depositor or her sister or the survivor, the court said:

"The question is whether this section was intended to do anything more than protect savings banks. It certainly was not

designed to make that a gift, which according to the evidence was not a gift, present or future, but only a convenient way of drawing money, * * *.''

This court has also held that regardless of the statute, the ownership of a deposit, payable to self or daughter, is determined by the intent of the depositor. In Andrew v. Citizens State Bank, 205 Iowa 237, 243, 216 N. W. 12, 15, speaking through Justice Stevens, the court said:

''The certificate was lawfully payable to her after her mother's death, upon the surrender thereof to the bank issuing it. Section 9267, Code of 1924. No other reason for the mother's making the certificate payable to herself or daughter than that she intended her to receive the money, unless paid out on her order is suggested. * * * *The manner in which the certificate was issued is, of course, not conclusive.* * * * [Citing cases]. While some of the foregoing cases hold that the mere form of the deposit, as entered upon the books of a bank and upon the pass book, is not sufficient to prove a gift, *there were circumstances in all of the cases that bore more or less directly upon the intention of the depositor.''* (Italics supplied.)

We call attention to this case only for the purpose of showing the court's construction of this statute. The mere fact that a bank deposit account, either time or checking, is a joint one from which either may draw, or demand payment, does not prove any ownership in the nondepositing payee, if the evidence is to the contrary. Appellant refers to the certificates of deposit as three-party contracts. This is true with respect to the right to make and to receive payment, but it is not true with respect to fixing or determining ownership, in fact, of the funds deposited, as between the joint payees. The appellant had the right to receive payment of any joint certificate, and there were many of them, but there is no evidence that she had a right to use the proceeds as her own by investment or otherwise, so as to deprive her husband of his ownership, title, or dominion over these funds. In all of the years in which she collected or renewed certificates there is no evidence that she ever attempted to do so. What she did in these matters she did for him. The same is true of his checking account. Baker testified that it was really a joint ac-

count, although during the years it never appeared so on the records, and he was never authorized to so treat it or designate it, and no individual money of appellant was shown to have ever gone into it. Appellant attended to the making of deposits, by mail or in person. She signed his name to checks. But there is no evidence that she ever drew any money therefrom to make any investments for herself, individually. What she did she did for him and not because of any ownership in the funds deposited. She had her own checking account and her own time deposits. She testified that she had loaned money to her half brother Ben Baxter. There is no evidence that she ever made withdrawals from her husband's account for that purpose. But she did on one occasion reduce her certificate of deposit from $6,769 to $6,214.44. She was a thrifty woman and she would hardly have withdrawn funds from an interest-bearing account, if she could have withdrawn this amount from his checking account. And there was always a substantial balance there.

This case is different in its facts from any of the cases cited or that we have found. In all of them the transaction under investigation was a single one, or quite definitely limited. They were special instances. But in this case the transactions are numerous. They are for the most part connected. They represent a course of conduct covering 15 or 20 years, and the methods which they adopted to invest the income of the farm to the best advantage. It is not reasonable to suppose that every time through the years that a time deposit was made or a bond was bought, even though it was payable to him or her or the survivor, that the transaction was a gift, contract, or trust, in which he irrevocably and without reservation parted with ownership in, and dominion over, the property, and vested it in her. Yet that is the contention of appellant. We think the record fairly justifies a finding that there was never any intention on the part of either of them of so transferring ownership and control, but that it was a method adopted solely for convenience, very largely because of his physical condition. His physical condition and the difficulty and limitation of his movements was in our judgment the moving consideration of having the instruments drawn to himself or to his wife, or even to the survivor, particularly, if, as he provided in his will, the

survivor was to collect, invest and conserve the property in trust for others. She never during his lifetime claimed any of his property. When a certificate became due or a bond was called there is no evidence that she ever failed to endorse or join in the presentation of the instrument for renewal or payment. Their method of investment, as fairly indicated by the entire record, was but a tentative one and for convenience. It no doubt became apparent to both of them that she would likely be the survivor. His ailment was one that progressively became worse. Just when the plan of disposition provided for in his will was decided upon does not appear. But the will itself clearly shows that he had no doubt that he had never irrevocably or unreservedly parted with title to any of the certificates, bonds, money or other personal property which he then possessed or which is involved in this litigation, or that he was not then the owner of all of it, with full right to dispose of it by will. Twice in his will he refers to his "securities". He had no other securities than the property just above mentioned. In Gould v. Logan, 198 Iowa 935, 939, 200 N. W. 490, 491, the testator had disposed of most of his personal property just prior to drawing his will. When he was making his will he stated that he had "disposed of most of my personal property." We there said: "* * * this statement could not well have had reference to anything except his shares of stock in the chemical company." And here we say that when John Sinift referred in his will to securities for investment and reinvestment "he could not well have had reference" to anything but the certificates and bonds and money or the proceeds thereof involved in this suit. The fact that he thereafter continued to invest the money he then had and thereafter acquired, precisely as he had invested it before, clearly indicates that the "survivor", as referred to in the instruments, was to hold the property solely as a trustee under the will. Appellant also contends that the bonds are contracts with the government definitely fixing the ownership of the bonds in the appellant, and that by their very terms they foreclose any right on the part of the appellees to question this ownership in the courts. She states the proposition thus in the resubmission argument:

"Under the record in the case at bar, the manner in which the payees were named in the United States Treasury certificates should conclusively establish their entire ownership in the survivor."

Appellees contend that this question, as above stated, and as argued on petition for rehearing and on resubmission, was hardly urged in the trial below or on original submission. There is much merit in this assertion, but without committing ourselves upon it, we have nevertheless fully considered the contention now made by appellant. Much of what we said with reference to a similar claim of appellant as to the effect of Code section 9267 applies to this contention.

Appellant relies upon the Act of Congress of September 24, 1917 [40 Stats. at Large 288], authorizing the issuance of the bonds in question, and upon paragraph 47 of Treasury Department Circular 300, of July 31, 1923. Appellees urge that, under the record made, there is no proper showing that a number of the bonds involved were issued subsequent to these regulations. Without attempting to determine this fact, we treat the regulations as applicable. The Congressional Act provides:

"The bonds herein authorized shall be in such form or forms and denomination or denominations and subject to such terms and conditions of issue, conversion, redemption, maturities, payment, and rate or rates of interest, not exceeding 4 per centum per annum, and time or times of payment of interest, as the Secretary of the Treasury from time to time at or before the issue thereof may prescribe. The principal and interest thereof shall be payable in United States gold coin of the present standard of value."

Paragraph 47 of the circular issued under authority of the Act is as follows:

"Assignments of Bonds Registered in the
Names of Two or More Persons.

"47. For transfer or exchange into coupon bonds.—When bonds are registered in the names of two or more persons in substantially the form 'John Jones and Mary Jones,' or 'John Jones or Mary Jones,' or 'John Jones and Mary Jones, or the

survivor,' the bonds are deemed to be held in joint ownership, with right of survivorship, and during the lives of the co-owners the Treasury Department will require assignments by all in cases of transfer or exchange into coupon bonds. In case of the death of any such co-owner the Department will, upon satisfactory proof of death and survivorship, recognize the survivor or survivors as owners, and will honor assignments by such survivor or survivors without regard to any administration of the estate of the deceased co-owner. Bonds should not be registered in the form 'John Jones or Mary Jones, or either of them,' but if so registered assignments by all the co-owners will be required in cases of transfer or exchange into coupon bonds and no right of survivorship will be recognized.''

We do not question the authority of Congress to enact legislation authorizing the issuance of bonds containing such restrictions and provisions, including rights of ownership, as it may see fit, but we do not believe that it intended to or did authorize the Secretary of the Treasury to fix by regulation the title to or the ownership of the bonds or the money owing thereon. Neither do we believe that any such power was intended or given by regulation 47. The purpose of the secretary and the remedy sought were the same as induced the enactment of such legislation as Code section 9267. It permits the treasury department to pay strictly, in accordance with the terms of the bond, and avoids the inconvenience, delay and burden of ascertaining the rights of the parties respecting title or ownership as between themselves, or anyone else. This is an entirely proper regulation. And we believe that it is all that was intended. Regulation 47 has only to do with the assignment of registered bonds, payable as these, for *''transfer or exchange into coupon bonds.''* It is for this purpose, only, that ''the bonds are deemed to be held in joint ownership.'' They are to be deemed, or treated, or considered as jointly owned for the purpose of this transfer or exchange, to expedite the work of the department, and not as conclusively determining ownership as between the payees. Otherwise the department files would be cluttered with certified copies of probate, and judicial proceedings which might delay its proper functioning for months and years. The regulation, by its language, recognizes that there will be administration, and that there

may be claims of ownership made, but that it will make the transfers or exchanges without regard thereto, leaving to the proper courts the determination of all conflicting claims of ownership between the parties. We have read the provisions of the Constitution of the United States, (Article I, section 8) the writings of Alexander Hamilton, (Federalist, No. XXXI) and of Thomas Jefferson, (Volume VI, page 421) and other authorities cited by appellant, including the cases of United States v. Sacks, 257 U. S. 37, 42 S. Ct. 38, 66 L. Ed. 118; United States v. Janowitz, 257 U. S. 42, 42 S. Ct. 40, 66 L. Ed. 120; Missouri v. Gehner, 281 U. S. 313, 50 S. Ct. 326, 74 L. Ed. 870; McCulloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579; Maryland Casualty Co. v. United States, 251 U. S. 342, 64 L. Ed. 297, the "gold clause" cases, Warren v. United States, 68 Court of Claims Rep. 634, and others, but, in our judgment none of them has any material application. No one questions the right or power of the federal government to borrow money, or to determine the provisions of the obligations which it issues, but we say that such right or power is not determinative of this lawsuit. We have also read In re Stanley's Estate, 102 Colo. 422, 80 P. 2d 332. The departmental regulations, and, what was in fact controlling, the intentions of the testatrix as shown by the evidence, were far different than in the case before us. That case is not controlling.

It is worthy of note that regulation 29, of department circular No. 300, extensively set out by appellant, in her resubmission argument, provides: "Detached assignments will not be recognized or accepted. Any assignment not made upon the bond is considered a detached assignment."

In In re Estate of Stockham, 193 Iowa 823, 830, 186 N. W. 650, 653, 22 A. L. R. 765, the question arose as to the efficacy of an assignment of a bond of the federal government, which did not comply with a regulation, under the same Act of Congress of September 24, 1917, presenting how an assignment should be made, in the nature of regulation 29, supra. Speaking through Stevens, C. J., the court there said:

"Was it intended by the treasury department that the provision of the bond quoted above should operate as a prohibition against the assignment of the bond by the owner for the mere pur-

pose of passing title to another, and to prevent the passing of title to an assignee, or is it to be treated as a regulation prescribed by the secretary of the treasury for the better convenience and security of the department and of the owner of the bond in the transfer and negotiation thereof, * * * we are satisfied that the language of the quoted provision should not be so construed as to impose an absolute prohibition upon the right of the owner to transfer title to the bond by assignment on the back thereof in the form provided, although not witnessed in the manner or by a person authorized by the secretary of the treasury.'' See also, Oquendo v. Federal Reserve Bank, 2 Cir., 98 F. 2d 708; United States v. Cutts, 25 Federal Cases 745, 748, No. 14912.

It is our judgment that there is no merit in the pleaded defenses of appellant based upon Code section 9267; or regulation 47, of circular No. 300 of the Secretary of the United States Treasury.

Our findings of fact, set forth herein, that it was never the intention of John Sinift to permit to pass from him at any time the absolute title to, ownership of, or control over, any of the property involved in this suit, during his lifetime, or thereafter, except as the same is disposed of under his will, and that he was the absolute owner thereof at the time of his death, without any restrictions or limitations, fully disposes of all other defenses, pleaded or argued, including gift, either inter vivos or causa mortis, trust, joint tenancy, contract, or original ownership, in the appellant. The trial court made similar findings with respect to the road bonds, the certificates of deposits, and all of the government bonds which were payable to him *or* her, or the survivor. With respect to $15,500 of the government bonds, payable to him *and* her, or the survivor, the trial court allowed the appellant one half thereof, or $7,750. Basing our conclusion on the facts, it is our judgment that John Sinift had no intention of making such a disposition of these $15,500 of bonds, or of singling out any bonds for a disposition different from the others, but that he had the same intention with respect to all of his certificates of deposits and bonds, and that is that he never intended to and never did renounce or part with the absolute ownership thereof, as herein found.

We therefore reverse the judgment and decree of the trial court on the appeal of the appellees respecting the award of the $7,750 of bonds to the defendant, and we affirm the judgment and decree on the appeal of the defendant-appellant. In view of the fact that it clearly appears that the appellant has little knowledge of how the securities in question are being handled, or have been handled, or what has been done with them, since the death of her husband, and that these matters have been left to another, either because of the appellant's inability, on account of advancing age or other causes, to give the matters personal attention, it is our judgment that the appellant as trustee of these properties, under the will of John Sinift, should be required to give such sufficient and proper security as will fully protect the appellees and other beneficiaries of that trust. The judgment and decree is therefore reversed in that matter. It is our judgment also that both the executor, Norman F. Baker, and the appellant should be required to promptly make written reports to the district court of Lucas county, giving complete inventories and accountings for property involved in this suit, including such part thereof as the deceased had at his death, and any additions thereto, or changes therein, by reason of income, interest, conversions or reinvestments. The district court of Lucas county is therefore directed to enter judgment and decree in conformity herewith.—Affirmed on appellant's appeal; and reversed and remanded on appellees' appeal.

HAMILTON, SAGER, MILLER, and HALE, JJ., concur.

STIGER, J., concurs in result.