NORTH AMERICAN NATIONAL INSURANCE COMPANY, Appellant, v. W. R. HOLSTRUM et al., Appellees.

No. 38259.

JANUARY 10, 1928.

SUPPLEMENTAL OPINION APRIL 5, 1929.

REHEARING DENIED JUNE 24, 1929.

*Bradshaw, Schenk & Fowler* and *W. W. Goodykoontz,* for appellant.

*Henderson & Jones* and *J. W. Henneberry, Jr.,* for W. R. Holstrum, appellee.

*T. J. Mahoney,* for intervener, appellee.

STEVENS, C. J.—I.   This is an action in equity upon a note

for $17,700, executed September 2, 1920, by W. R. Holstrum, appellee, to the First Trust & Savings Bank of Des Moines, and  to foreclose a mortgage upon a tract of 160 acres situated in Boone County, executed at the same time, to secure the payment of said note. $15,000 of the consideration for the note was a part of the subscription price of 100 shares of the capital stock of the Great Republic Reinsurance Company of Des Moines. At the time the first stock was subscribed for, appellee gave two "myself" notes for $1,250 each, which he subsequently paid. At the same time, he executed another note for the balance of the subscription price of the stock. Five days later, he subscribed for 50 additional shares of stock, repeating the transaction, and making the notes to correspond. The note in suit was given in renewal of the prior notes aggregating $15,000, and included therein the amount of a prior incumbrance upon the farm. These several items make up the $17,700.

The defendant in his answer admitted the execution of all of the aforesaid instruments, but alleged as an affirmative defense that he was induced to do so by fraud. We quote in part the allegations of the petition, as follows:

"* * * falsely and fraudulently represented and stated to defendant that said stock was at the time well worth $200 per share, and that in fact it had a market value of more than $200 per share; that, while its nominal par value was $100 per share, it was issued and sold from the treasury of said company at $200 per share, 50 per cent of such purchase price being turned into the treasury of the company, and 50 per cent thereof, or $100 per share, being deposited with the insurance commissioner of the state of Iowa; that said company was, at the time, officered and managed by competent, honorable, reliable, and experienced men in the insurance world,—and pretended to submit and offer documentary evidence of the competency and reliability of said officers; that all of the purchase price of said stock went into the treasury of the company in the manner hereinbefore related, no part thereof being used for commissions or sales expenses, and that the salesmen were being paid a salary only for their services; that the value of said stock was rapidly going up, and said stock would soon be worth $300 per share,—and in fact they repre-

sented, undertook, and agreed to resell said stock for this defendant at $300 per share; that said company was on a profit-earning basis, and was earning large profits and declaring large dividends; that the earnings of said company were such that the dividends on the stock purchased by the defendant would pay the principal, as well as the interest of the notes proposed to be executed for such purchase price; that the stock of the said Great Republic Reinsurance Fire Company was for sale only to stockholders in a certain companion company hereinafter referred to, and known as the North American Fire Insurance Company, but that, as a special concession to this defendant, they would procure for and sell to him 50 shares of said stock, he not being a stockholder in the said North American Company, although it was against the rules and regulations governing the sale of such stock; and that it was a special favor to this defendant to be allowed to buy 50 shares thereof, that being the utmost number of shares they could procure for sale to him; that the said salesman Johnstone was a 'field man,' clothed with special authority, and that he was superior to the ordinary stock salesman, because of which he could and would procure the issuance of said 50 shares of stock; that stock to the amount of a million dollars had been sold to Iowa stockholders and investors, and that the same was being rapidly sold and rapidly absorbed in the available stock market of this and other states.''

As stated, five days intervened between the date of the first subscription for stock and the last. The answer alleged that substantially the same false and fraudulent representations were made to secure the later subscription, but with the following added:

''That thereafter, and sometime later in the fall of 1919, the said stock salesmen, the said Johnstone and Graba, again appeared at the home of this defendant, and again solicited him to buy 50 more shares of the stock of the said Great Republic Reinsurance Fire Company. That, in the meantime, said salesmen had discovered that this defendant had in fact subscribed for and purchased $2,500 of the capital stock of the said North American Fire Insurance Company, under the circumstances more particularly stated in a later subdivision of this answer; and they represented to him that they were now free to allot and sell him 50

more shares of the capital stock of the said Great Republic Company.''

It is further alleged in the answer that, on or about September 18, 1920, one Becker, who was the treasurer of the Great Republic Reinsurance Fire Company, induced appellee, by substantially the same representations, to execute the note and mortgage in question. The answer further alleges the falsity of each and all of the representations charged, appellee's belief of the truth thereof, and his reliance thereon.

In a separate paragraph of the answer, the defendant further alleged that, on or about October 15, 1923, which was immediately after appellee discovered the fraud that had been perpetrated upon him, he rescinded all of the stock subscription contracts by giving notice in writing to the proper parties thereof. He therefore asks that the note and mortgage be rescinded and cancoled, and that he have judgment for all payments previously made by him on the subscription price of the stock.

In addition thereto, appellee alleged that he was induced by the fraudulent representations of the agents of appellant to, on November 12, 1919, subscribe for 10 shares of the capital stock of the North American Fire Insurance Company, which were never delivered to him; and he asked judgment for $2,500, the amount paid therefor.

The affirmative allegations of the answer were all traversed by a reply.

A brief history of the two corporations referred to in the pleadings and also in the evidence, and of the several transactions involved in the controversy, is essential to anything like a clear understanding of the questions before us for decision. The appellant, North American National Insurance Company, is the result or outgrowth of two separate and distinct organizations. Appellant was originally incorporated in 1918, as the Farmers Crop Insurance Company, with an authorized capital of $100,000, no part of which was sold. On March 5, 1919, its corporate name was changed to the North American Fire Insurance Company, and its authorized capital increased to $500,000. The shares of stock were then all sold, at $200 per share, $100 of which was denominated surplus. The campaign for subscriptions for stock resulted in an oversubscription of approximately 50 per cent.

On August 23, 1919, the articles of incorporation were amended so as to increase the authorized capital of the company to $750,-000. In September of the same year, some of the promoters of the North American Fire Insurance Company, with others, organized a new company, to be known as the Great Republic Reinsurance Fire Company, with an authorized capital of $1,000,-000. Before the first of January following, subscriptions for stock aggregating $1,981,700 had been taken in the new company, and were in the possession of the company. Later, and in 1921, the corporate name of this company was changed to the Great Republic Insurance Company. The business of both companies was transacted by the same persons and from the same office. Subsequently, in 1923, the two companies were merged, and became the North American National Insurance Company.

The evidence of appellee as to the alleged fraudulent representations of the stock salesmen, who alone testified on the point, will be found to sustain the allegations of the petition in most particulars. It was during the third visit of the representatives of the Great Republic Reinsurance Company that appellant signed two subscriptions for stock, each for 25 shares. The agents who procured the subscriptions were Johnstone and Ferrell. Four notes were executed, two for $1,250 each, payable to "myself," and two for $3,750 each, payable to the corporation. According to the date on the instrument, appellee signed an agreement for the purchase of 10 shares of the capital stock of the North American Fire Insurance Company, at $250 per share, on November 12, 1919. On November 18th, he signed an additional subscription for 50 shares of stock of the Great Republic Reinsurance Fire Company, executing one "myself" note for $2,500, and an additional note payable to the corporation for $7,500.

Appellee testified that Johnstone said he was the field man for the company, and assisting Ferrell in securing subscriptions for stock; that he displayed a clipping from a Chicago paper, stating that foreign reinsurance was a thing of the past in this country, and congratulating the president of the Great Republic Company on the fact that he was launching out and starting a reinsurance company; that its earnings would be a high percentage (figures from some German companies were quoted, showing an annual profit of 400 per cent) ; that Johnstone stated

that German companies could no longer operate in this country, and that it was not often a person could avail himself of the opportunity to buy stock in a concern such as the Great Republic Reinsurance Company. He further testified that Johnstone said that he really did not have authority to sell stock to a non-subscriber for stock in the original North American, but that his special authority as field man led him to offer 50 shares. Appellee further testified that Johnstone said that the value of the stock was going up rapidly; that little remained for sale; that it would reach $250 per share; that it would go to.$300; that it was selling on the curb in Des Moines for $250 per share; that it would soon be selling for $300; that 50 per cent of the proceeds of the sale would go into the treasury of the company, and the other 50 per cent would be paid to the insurance department, for the protection of subscribers; that the agents were getting their pay, whether they sold stock or not. Johnstone, so appellee testified, agreed to resell 75 per cent of the stock for $300 per share. An agreement to that effect, he said, was written on the margin of the subscription blank.

Concerning the transaction of November 18th, when the second subscription for 50 shares was signed, appellee testified as follows:

"I did not see Johnstone and Ferrell for something like a week or ten days, when they came to my place again, and talked to me while I was out in the field, plowing. They congratulated me on the purchase of 10 shares of North American, and stated that I was entitled to 50 more shares in the Great Republic Reinsurance. I told him I would take 50 more shares, on condition that he sell these 10 shares of the North American. They immediately proceeded to write the application for 50 additional shares. Exhibit 1 is the subscription paper that they wrote up for me at that time. They said that the stock was going to sell for $300 a share, 'as sure as God made green apples,' was the exact words. He said that North American was selling at that time at 290 or 295,—290 bid, in Des Moines. He said it would go to $300, and he can agree to sell 75 per cent of this second issue at $300 per share. I agreed to that, on the same method as formerly. He put it in writing on the margin of the application. * * * They said the dividends would take care of the sub-

scriptions,—the notes executed; that I would never need to pay the notes, because the earnings of the company would be enormous."

None of the subscription contracts introduced in evidence bear, on their face, the alleged agreement to resell the stock for $300 per share; but appellee testified that it was written on the lower margin, and that it had evidently been removed. The bottoms of each of the contracts show perforations. Some further details of the organization, sale of stock, business and financial condition of the two companies, should now be stated.

The only assets of the Great Republic Reinsurance Company or of appellant at the time the transactions in question were had, consisted of cash receipts, bonds taken in lieu thereof, and notes derived from the sale of stock. The Great Republic Company was authorized to do business about January 1, 1921. The sale of stock of each company was managed and conducted by a fiscal agent. The selling agency was paid 25 per cent in cash of the subscriptions received. Thus, in the case of appellee, the agent's commission was $5,000. The total amount of commissions paid to agents of the Great Republic was $495,425, and something like $375,000 to the sales agency of the North American. The largest amount of paid-up capital ever owned by the Great Republic Reinsurance Fire Company was $330,000. No dividends were ever earned or paid by it. Notwithstanding the fact that this was the condition of the company, it paid, for a portion of the time, annual salaries to officers in excess of $30,000.

On or about January 1, 1924, B. F. Carroll was elected president of the appellant company. It obviously early became apparent to him that its financial condition would not warrant its continuance in business, and on May 1st, all of its available business was sold and transferred to a Minneapolis company for approximately $85,000. Since that time, the company has been in process of liquidation. $55 per share has been paid to stock subscribers. Further dividends will be paid in the future, the amount of which cannot be large.

On May 26, 1919, at a special meeting of the board of directors of the North American Fire Insurance Company, a resolution was adopted advancing the price of stock to $250 per share, and authorizing the president and secretary, if they

deemed it advisable, to further increase the price to $300. The resolution was not carried out in the sale of stock. The foregoing resolution of the board of directors is important only as it throws light upon the attitude of the promoters and managers of the company and of the campaign for the sale of stock. It is claimed by appellant that the treasury stock was approximately all sold at the time the resolution was adopted. The selling subsequent to June purported, on the face of the contract, to be of privately owned stock. Everyone connected with both institutions knew that the actual value of the stock did not exceed that of the subscription contracts. If they were paid, the stock would have substantial value, and there would be a chance for the companies to engage in business, perhaps successfully. They had, however, no established business, nor were they even authorized to engage therein. The payment in cash of approximately one-half million dollars to stock salesmen as commissions was most extraordinary, notwithstanding the contention of appellant that this was in harmony with the custom then prevailing. This in itself merits condemnation.

The elements constituting fraud, the burden of proving which was upon appellee, are too familiar to require discussion or the citation of authority. The challenge of appellant is that the evidence wholly fails to show either the falsity of the alleged representations or the intention on the part of the company to deceive. Much stress is laid in argument upon the feverish financial conditions prevailing in 1919 and 1920, and the depression that soon followed. This argument works both ways. The psychological conditions that gave abnormal stimulus to investments were easily made the instrumentality of all kinds of speculators, to bring about the organization of apparently promising business concerns which might be promoted at tremendous profit. The effect upon the victim was no less disastrous than it was upon the promoter. Many of the representations made to appellee were wholly false. Some of them were not. He was at the time about 44 years of age, a farmer, with little or no knowledge of the insurance business. That he accepted and believed the extravagant statements and representations of the sales agents we have no doubt. Every officer and agent of both companies must have known the nature and character of the assets thereof, and the possibility of engaging in business, earning divi-

dends, etc. Some of the representations referred to future achievements of the organizations; but the whole series of statements made to induce appellee to subscribe for stock were closely interwoven, and must be considered together,—that is, the whole scheme must be taken into consideration. Perhaps the organizers of both companies hoped for better results, but the method of doing the business indicated the lack of proper regard for the safety of its investors, and the promises made during the period of great inflation were not, and perhaps could not have been, safeguarded. Some of the officers were experienced insurance men. Many were not. We have no difficulty in reaching the conclusion that all of the subscriptions for stock, notes executed, and payments made at or about the time, were fraudulently procured. We deem it unnecessary to more specifically point out what of the representations were false. The mere recital of the facts is sufficient. Our conclusion is well supported by authority. *Larson v. Stanton State Bank*, 202 Iowa 333; *McCorkle v. Lessenger*, 200 Iowa 967; *Newton v. Young*, 197 Iowa 1143; *Faust v. Parker*, 204 Iowa 297.

But it is further contended by appellant that, by the execution of the renewal note and of the mortgage sought to be foreclosed, appellee waived the original fraud, if any. Appellee testified that the officers of the company, at whose solicitation the note and mortgage in suit were executed, reaffirmed the truth of the representations that had been made, and made further statements similar in character. The officer denied the testimony of appellee on this point, and asserted that he fully and frankly advised him of the exact situation of the business. The court below accepted the testimony of appellee. It is consistent with the entire course of dealing,—at least, this is shown by his own testimony, which is not contradicted. On this point we accept the finding of the trial court.

Becker, the treasurer of the company, who obtained the execution of the note and mortgage, was called as a witness for appellee. Evidence both favorable and unfavorable to appellee  was given by this witness. While, in a sense, appellee vouched for the credibility of the witness, he is not precluded by his testimony, and may offer other testimony to contradict it. *Wilson v. Prettyman*, 195 Iowa 598.

Judgment was entered against appellant for the $5,000 paid as commissions to the agents who took the stock subscriptions. It is contended by appellant that in attempting rescission of the contracts appellee failed to make an unconditional tender of the trustee's stock certificates that had been issued to him. One certificate, No. 230 for 52 shares of North American National Insurance Company stock was held by the First National Bank of Boone as collateral security for indebtedness of appellee. A petition of intervention was filed by the bank upon which certain conditions applicable only as between the bank and appellee were imposed. The stock was, however, tendered unconditionally to appellant. This was sufficient.

II. We have already called attention to the purchase by appellee, on November 12, 1919, of ten shares of the capital stock of the North American Fire Insurance Company, for which he paid $1,250 in Liberty bonds, and gave his "myself" note for an equal amount. The note was sold to a local bank, and paid. The transaction with appellee was conducted by one W. P. Lohman. The contract signed was printed at the top in large letters the words "Contract for sale of stock of the North American Fire Insurance Co., Des Moines, Iowa," and contained the following provision: "All payments will be made payable to O. G. Chesley, at Des Moines, Iowa." Lohman's name was originally written in, as the seller of the stock. Thereafter, the name Albert Anderson was written in blank. Albert Anderson is a brother-in-law of appellee's, and had given his subscription for 100 shares of the capital stock of the above-named company. All he ever paid on the subscription was the $5,000 paid at the time the subscriptions were signed. This money was paid in to the company, and immediately returned to the agents. No stock was ever delivered to appellee, nor did he know definitely what had been done with the contract until April 1, 1920, when he was advised by appellant, in response to a letter of inquiry addressed thereto, that he had purchased 10 shares of the Anderson stock, and that, while the transaction was between appellee and Anderson, yet the company was instructed to issue 10 shares of stock to him, upon payment of the note. The letter added: "So you can see you have been given proper credit in the transaction." Becker testified that Lohman was not at this time the agent of

the company, although he formerly was, and that the transaction was wholly personal between the parties named in the contract. Chesley was at this time president of the company. No one was able to testify as to what became of the payments made. We are not advised whether Chesley was available as a witness, but, if so, he was not called. If the testimony of appellee is to be believed, Johnstone and Ferrell, at one of their visits to his home to solicit subscriptions for stock, congratulated him upon the purchase of these shares of stock, and made that the basis of their authority to sell him Great Republic stock. The inference may thus properly be drawn that the contract was immediately delivered to the company. The following indorsement appears on the back of it:

"North American Fire Ins. Co., D. M., Ia. I hereby authorize you to issue from my stock ten shares to W. R. Holstrum when my stock is paid for and proper assignment made. Albert Anderson."

Prior to this time, subscriptions for 100 shares of stock in the North American had been signed by Anderson, and were held by the company. It is claimed that the note given by him for $15,000 was sold to a bank in the city of Des Moines, and that the trustee's certificates were assigned to the bank as collateral security for the note. The testimony, however, shows that this stock was paid for, and issued and delivered to persons other than appellee. Of these shares, 50 were issued or assigned to Chesley, president of the company, and two to Becker.

Appellee did not know that he had purchased stock of Anderson until he received the letter from the company above referred to. The evidence as to this item of the counterclaim for which the court gave appellee judgment is more or less unsatisfactory.

The contract, in appearance, is very much like the subscription contract signed by appellee, and soon found its way into the possession of the company. The failure of the appellee to trace the proceeds of the sale of stock to the company is, of course, the weak place in his case. Taking the transaction as a whole, it seems to us, however, that the evidence is sufficient to justify the judgment entered.

The transaction was conducted much the same as others at and subsequent to May 26, 1919, the date of the resolution pro-

posing to increase the price of stock. Sometime after the decree  was filed, appellant filed a petition for a new trial asking that the judgment rendered in favor of appellee be modified or canceled. The ground of the petition was newly discovered evidence. This related largely to the so-called Anderson transaction. Anderson lived at Stratford, where most of the transactions involved in this action were had. He could have been easily interviewed and produced as a witness upon the trial. The importance of his testimony was not, however, fully known until after the decree was entered. It was shown upon the hearing of the petition that Anderson never paid for or owned any shares of stock, and that his note was not paid by him. The record does not disclose by whom payment for the stock was made, nor does it appear how the bank came to surrender the certificate held by it as collateral security. Possibly the note was paid. The court overruled the petition, and plaintiff appeals also from this ruling.

Appellant knew, at the time of the trial, of the interest of the Des Moines bank in the stock, and all that the testimony disclosed relating to the transaction between Lohman and Anderson. It is not sufficient to justify the granting of a petition for new trial that material and important testimony comes to light after a decree had been entered. Diligence in ascertaining the facts and procuring the testimony must also be shown. This, we think, was not done in this case. The petition was properly overruled.

The recital of the facts in the foregoing opinion is incomplete, and omits reference to many matters of more or less value to one or the other of the parties. We have also omitted reference to numerous propositions discussed by counsel. The record has been read and reread, and every fact disclosed thereby, as well as the propositions urged in argument, given thorough consideration. We have discussed all of the decisive questions in the case.

There is a suggestion by appellant that the items of the counterclaim were barred by the statute of limitations. If so, the bar was waived by the failure to interpose the same as a defense.

It is also urged that proof of the market

value of the stock is wanting. Proof that it was never worth even approximately the agreed price, and that it was subsequently sold for less than 25 per cent thereof, is not wanting. The evidence relied upon to establish appellee's right of rescission is clearly sufficient.

It is, therefore, the conclusion of the court that the decree and judgment entered is sustained by the greater weight of the evidence.—*Affirmed.*

EVANS, FAVILLE, KINDIG, and WAGNER, JJ., concur.

SUPPLEMENTAL OPINION.

PER CURIAM.—Upon consideration of the petition for rehearing filed in this case, and a thorough rereading of the record, we have reached the conclusion that the evidence is insufficient to sustain the recovery in favor of the appellee on his counterclaim. The particular transaction is not shown to have been had with a representative of the appellant, the stock purchased belonged to a private individual, and the transaction is not satisfactorily shown to have been made for or on behalf of the appellant. The evidence does satisfy us that the contention of appellee is correct. Without any attempt to again review the record on this point, we shall content ourselves with the mere statement of the conclusion that we are now of the opinion that the counterclaim should have been dismissed. The former opinion is modified to this extent, and the judgment awarded on the counterclaim is reversed. In all other particulars, the petition for rehearing is overruled.—*Reversed in part; petition overruled.*