DALE M. YOUNGBERG, individually and as trustee, appellant, v. LILLIE HOLSTROM, individually and as executrix of estate of William R. Holstrom, and MARIE LOUISE WITTMER, appellees; RUSSELL S. ANDERSON et al., defendants-appellants.

No. 50097.

(Reported in 108 N.W.2d 498)

APRIL 4, 1961.

Lund, Lund & Wood, of Webster City, for appellant.

Doran, Doran, Doran, Erbe & Doran, of Boone, for defendants-appellants.

Mahoney, Jordan, Statton & Smith, of Boone, for appellees.

GARFIELD, C. J.—This is a suit in equity by Dale M. Youngberg, individually and as trustee for certain defendants who joined with him, for specific performance of an alleged oral agreement between William R. Holstrom, deceased, and his predeceased wife, Nettie C., to make mutual wills. Following trial to the court relief was denied. Plaintiff and the defendants who joined with him have appealed.

October 16, 1942, William and Nettie executed reciprocal wills prepared for them by Mr. F. J. Lund, a Webster City attorney. The important provisions of William's will are:

"1. I give, * * * all of my property * * * I may own at the time of my death, to my beloved wife, Nettie C. Holstrom, to be hers absolutely and forever, subject, however, to paragraph 3 [sic] hereof.

"2. In the event I should survive my said wife, or in the event that the said property or any part thereof should be in her hands and undisposed of by her by Will or otherwise at the time of her death * * * I desire and direct that all of my property and/or such property remaining in her hands and undisposed of at the time of her death, shall go to * * * her brother, Morris Carlson, as trustee, he to hold said property in trust for the benefit of the nieces and nephews of myself and my said wife, with full power on his part to * * * give and distribute the said property and/or the proceeds therefrom to such of our said nieces and nephews as he may designate and in such an amount and in such a way as in his best judgment will be for the best interests of our said nieces and nephews.

All of which may be done without the authority or intervention of any Court."

This will contains no paragraph numbered 3. The reference thereto should have been to paragraph 2. The will names Nettie's nephew, plaintiff Dale M. Youngberg, alternate trustee. The defendants who joined with plaintiff in the relief asked are other nephews and nieces of William or Nettie. Nettie's will is the same as William's except for transposition of names. Plaintiff claims these wills were executed pursuant to a binding oral agreement between the makers to dispose of the property of each in a certain way, hence are mutual. For definitions and distinction between "reciprocal" and "mutual" wills see Father Flanagan's Boys' Home v. Turpin, 252 Iowa 603, 607, 608, 106 N.W.2d 637, 639, 640.

The cited precedent points out that under several recent Iowa decisions, in order for either maker of an alleged mutual will to be denied the right to revoke, it must appear by clear and satisfactory evidence, or on the face of the wills, they were executed pursuant to such contract provisions between the makers. We have also said the proof must be clear, satisfactory and convincing. In re Estate of Ramthun, 249 Iowa 790, 799, 89 N.W.2d 337, 342.

Will and Nettie were married May 19, 1923. Nettie was then 35, Will 42. Will had been married before and divorced. The two lived together, mostly on the 160-acre farm here in controversy, until Nettie died April 20, 1943, from cancer she had had about a year. They had no children. July 1, 1947, Will married Lillie with whom he lived until his death May 3, 1959. Lillie had a daughter, Mary Louise Wittmer, by a previous marriage. These two are defendants-appellees.

November 12, 1957, Will executed a later will, evidently prepared by J. E. Burnstedt, another Webster City attorney, revoking former wills. This will gives Lillie testator's personalty, three fifths of his real estate and income from the rest of it for life. Subject to these provisions, half the remainder of the estate goes to Will's brother Victor and the other half to a nephew and niece on condition. After Will's death this will was probated and Lillie was appointed executrix.

Aside from the reciprocal provisions of the first wills and their simultaneous execution, plaintiff relies for proof of the alleged oral agreement sought to be enforced on the testimony of Mr. Frank J. Lund, then age 83, the attorney who prepared the wills more than 17 years before the trial. He testifies Will and Nettie came to his office together, after Will had first consulted him alone about a deed, and it was agreed the wills should be made. "So we lit on this method of two wills with an absolutely sincere promise, I think, on both of their parts that nothing would be done to cancel those wills." Mr. Lund says he suggested leaving the wills with the clerk of the district court, cautioned the makers they should be left there, he took them to the clerk's office for safekeeping, they remained there until after Nettie died and he then withdrew Nettie's will. It was probated and Will was made executor. The probate inventory and final report, both sworn to before Mr. Lund and apparently prepared by him, recite Nettie left no property. The firm bearing Mr. Lund's name and including his son represents plaintiff in this suit on a contingent basis although Mr. Lund is rather inactive in the firm.

Some members of the court would hold it is not shown by clear and satisfactory proof that Will and Nettie orally agreed to make irrevocable wills. However, since the conclusion reached on another phase of the case is decisive of it we do not pass on the sufficiency of such proof. Indeed we may assume, without so holding, proof of such an agreement is sufficient.

 But it does not follow that plaintiff is entitled to specific performance of the agreement. The trial court held consideration for it was insufficient to call for such a decree. We think this conclusion was not an abuse of discretion and concur in it.

Will acquired the 160 acres in controversy February 1, 1909. In September 1920 the land was mortgaged for $17,700 to secure a note Will signed at least partly for his brother in the purchase of "blue-sky" stock. In 1929 we held the mortgage invalid and it was released. North American National Ins. Co. v. Holstrum, 208 Iowa 722, 217 N.W. 239, 224 N.W. 492. The farm was then mortgaged for $14,000, released in 1938, then

mortgaged for $12,000, released March 29, 1946, nearly three years after Nettie died. When she died Will's bank balance was $200. When Will died 16 years later the balance in a joint account in the names of Will and Lillie was $11,422. Will also acquired, evidently at least five years after Nettie died, the residence of his parents in the town of Stratford, valued at $12,500, by paying liens and taxes against it and other obligations of the parents. Will claimed the amounts paid were not far from the value of the property. Plaintiff sought to include this property in the present suit.

Except for some household furniture and a piano that Nettie had when she married Will (it was her first marriage) she never had property of her own. Nor, so far as appears, did she have any prospect of acquiring any, when the wills were made or thereafter, except from her husband if he should predecease her. Aside from the furniture, to which we will refer later, Will acquired nothing under Nettie's will.

In arguing consideration for the agreement was sufficient appellants seem to rely most on evidence that Nettie performed the usual duties of a farm wife, such as raising poultry, at times hogs, and had a big garden. It is true Nettie, as well as Will, worked hard and were happily married. Reliance is also placed on the fact Nettie inherited from her father $3346, much of which was probably used to pay. a note signed by her and Will for $2500 borrowed from her brother-in-law soon after their marriage to pay for remodeling the house on the farm. Two hundred twenty-seven dollars of this inheritance was received more than 18 years before the 1942 wills were made and the remaining $3119 was received and the $2500 note was paid about 15 years before then. It is also said Nettie gave up her opportunity to receive a deed to the farm.

The present case is strikingly like Levis v. Hammond, 251 Iowa 567, 100 N.W.2d 638, decided 22 days after the trial court's decision here, and we think is ruled by it and the authorities there cited. The mutual wills there were made by Maud and Dave Flum. Dave survived his wife. Basis of our Levis decision, amply supported by cited authorities, is therein stated (page 575 of 251 Iowa, page 643 of 100 N.W.2d):

"Since Maud had no property when the first wills were

made, no prospect of acquiring any except from her husband and none was acquired, we think it was not an abuse of discretion to deny plaintiff specific performance. Although the mutual promises may have amounted to technical consideration for the agreement, the really substantial consideration passed from Dave to Maud. Dave received no real benefit from either the agreement or Maud's will. Certainly there was great inequality of consideration moving from the two makers. Thus the agreement was not sufficiently fair and reasonable to entitle plaintiff to the relief asked."

In Levis v. Hammond the wife inherited from her father $1733 which by inference, and we assumed, was applied on the indebtedness against the farm in controversy. Maud also performed the usual duties of a farm wife for 44 years (38 years when the wills were made), like those Nettie performed here for 20 years. Of these facts, similar to those relied upon here, the Levis opinion states (pages 575, 576 of 251 Iowa, page 643 of 100 N.W.2d): "* * * Assuming Maud's inheritance was thus applied on the mortgage this occurred more than 23 years before the first wills were made. Clearly any benefit to Dave on this account is wholly unrelated to the agreement to make the first wills. [citation] This observation also applies to the fact Maud performed the usual duties of a farm wife, cared for the chickens and garden, helped with the milking and even with picking corn."

So here it cannot be claimed any benefit to testator from the disposition made of Nettie's inheritance or from her performing the usual duties of a farm wife was in any way related to the alleged oral agreement to make the first wills. Aside from the technical consideration the mutual promises to make wills may have supplied, there is nothing but a moral obligation at best arising from past services and an advancement from Nettie to her husband. There was no legal obligation to pay for the services nor to repay the advancement. Nor is it shown Nettie expected to be paid or that testator expected to pay her.

An important precedent on the question of consideration as applied to the present case is Dullard v. Schafer, 251 Iowa 274, 278, 100 N.W.2d 422, 425, cited in Levis v. Hammond, supra,

822

at page 576 of 251 Iowa, page 644 of 100 N.W.2d. There a father agreed in writing to leave all his property to his son for the stated consideration that the latter had " 'deported himself as a dutiful and loving son, and has thereby contributed to his father's acquisition and maintenance of the property.' " We held the consideration was inadequate to warrant a decree of specific execution of the contract and that denial of such relief was not an abuse of discretion. This from the opinion is applicable here (pages 283, 284 of 251 Iowa, page 428 of 100 N.W.2d):

 "A recitation of past services, especially those where there is nothing to show that payment therefor was contemplated by the parties when rendered, are by one line of authorities, including Iowa, declared insufficient to support a subsequent executory promise. * * * It may be said generally that we favor the rule that unless it is made to satisfactorily appear that the services rendered were not intended originally to be gratuitous, no obligation arose, even though some benefit had been derived by the promisor and detriment suffered by promisee. * * *

"Ordinarily there is a presumption that services of a general and unspecified nature rendered between members of a family, such as father and son, are gratuitous." (Citation)

 Many other authorities for the view that Nettie's services in performing the duties of a farm wife are presumed to have been gratuitous include: In re Estate of Talty, 232 Iowa 280, 283, 5 N.W.2d 584, 586, 144 A. L. R. 859, 861, and citations; In re Estate of Klepper, 244 Iowa 521, 526, 57 N.W.2d 565, 567, and citations; Ferris v. Barrett, 250 Iowa 646, 649, 650, 95 N.W.2d 527, 529, 530, and citations; 98 C. J. S., Work and Labor, section 16, page 741; 58 Am. Jur., Work and Labor, section 11. The presumption has not been rebutted here.

Allen v. Bryson, 67 Iowa 591, 596, 25 N.W. 820, 56 Am. Rep. 358, cited with approval in Dullard v. Schafer, supra, 251 Iowa 274, 283, 100 N.W.2d 422, 428, is another important precedent on the question of consideration in the present controversy. We there say: "If the services are gratuitous, no obligation, either moral or legal, is incurred by the recipient. No

one is bound to pay for that which is a gratuity. No moral obligation is assumed by a person who receives a gift. * * * In such case there never was any liability to pay, and therefore a subsequent promise would be without any consideration to support it."

Lanfier v. Lanfier, 227 Iowa 258, 261, 288 N.W. 104, 106, also approved in Dullard v. Schafer, says: "This court has repeatedly held that past or moral consideration is not sufficient to support an executory contract. One of the cases most cited on this proposition is that of Allen v. Bryson, 67 Iowa 591, 25 N.W. 820, 56 Am. Rep. 358." See also Gooch v. Gooch, 178 Iowa 902, 906, 160 N.W. 333, L. R. A. 1917C 582.

An annotation in 140 A. L. R. 491, states: "There is little conflict in respect to the rule that when it is clear that services of one member of a family to another were intended to be gratuitous at the time of their rendition, they can be no consideration for a subsequent note or other executory promise by the recipient of the services to pay therefor."

That a moral obligation is insufficient consideration to support an executory promise in the absence of a pre-existing legal obligation to do the thing promised or of expectation of payment see the extended annotation 17 A. L. R. 1299, 1318, 1366, supplemented in 79 A. L. R. 1346, 1354; Annotation, 8 A. L. R.2d 787, 801; 12 Am. Jur., Contracts, section 107. See also Meginnes v. McChesney, 179 Iowa 563, 574–578, 160 N.W. 50, L. R. A. 1917E 1060.

It is not to be inferred from the above that an agreement by testator, if there were such, to pay for Nettie's services would be valid. It is well settled that a husband's agreement to pay for services within the scope of the marital relation is without consideration and contrary to public policy. Bohanan v. Maxwell, 190 Iowa 1308, 1319, 181 N.W. 683, 14 A. L. R. 1004; Reid v. Reid, 216 Iowa 882, 885, 249 N.W. 387; In re Estate of Straka, 224 Iowa 109, 111, 275 N.W. 490; Annotation, 73 A. L. R. 1518; 41 C. J. S., Husband and Wife, section 130, page 603. See also Sinift v. Sinift, 229 Iowa 56, 66, 293 N.W. 841. Most, if not all, of Nettie's services were within the scope of the marital relation.

■ Our conclusion that use of Nettie's inheritance, with her consent, to repay money borrowed to remodel the dwelling on the farm, without any contract by Will to repay Nettie, is insufficient consideration for the alleged agreement in suit also finds support in Hanson v. Manley, 72 Iowa 48, 52, 53, 33 N.W. 357; Jones v. Storms, 90 Iowa 369, 371, 57 N.W. 892; Tyler v. Budd, 96 Iowa 29, 33, 64 N.W. 679; Hayward v. Jackman, 96 Iowa 77, 79, 80, 64 N.W. 667.

It is true that when Nettie died she left some household furniture which Will sold. It does not appear how much it brought. It is unlikely it was enough to pay costs of administration, expenses of Nettie's last sickness and funeral (she died following an operation for cancer for which she was hospitalized in Des Moines), and cost of a marker at her grave. Will paid these costs and expenses. He was entitled to reimbursement therefor from Nettie's estate, if she left any. Truax v. Ellett, 234 Iowa 1217, 15 N.W.2d 361, and citations; In re Estate of Kneebs, 246 Iowa 1053, 1059, 70 N.W.2d 539, 543.

■ The contention Nettie gave up her opportunity to receive a deed to the farm in return for the alleged agreement to make mutual wills needs little comment. There is evidence Will consulted his attorney, Mr. Lund, about making a deed to Nettie. This testimony was properly objected to as a privileged communication between client and attorney, under section 622.10, Code, 1958. Krieg v. Grant, 248 Iowa 396, 399, 80 N.W.2d 724, 726, and citation. It is true communications between both Will and Nettie, on the one hand, and Mr. Lund were not subject to this objection. Luthy v. Seaburn, 242 Iowa 184, 188, 46 N.W.2d 44, 46, and citations; Henke v. Iowa Home Mut. Cas. Co., 249 Iowa 614, 618, 87 N.W.2d 920, 923, and citations. And for this reason there is some testimony that is not objectionable.

■ In any event it appears Mr. Lund advised Will against making a deed and the advice was accepted. Nettie had no enforceable right to a deed and of course gave up no such right, in return for the alleged agreement or otherwise.

We need not repeat what is said in Levis v. Hammond, supra, 251 Iowa 567, 576, 100 N.W.2d 638, 644, and authorities

there cited to the effect a suit for specific performance of an agreement is addressed to the sound judicial discretion of the chancellor, guided by the general principles of equity.

The right to make a will as a person chooses is a valuable one of which he should not be deprived by such an agreement as plaintiff seeks to enforce unless it is supported by adequate consideration and is fair and reasonable. Here, as we have tried to explain, Will received no real benefit from the claimed agreement or Nettie's will.

Incidentally, the trial court thought the equities are with the surviving spouse and her daughter. Lillie lived with Will 12 years, lacking less than two months. There is no evidence of undue influence or inequitable conduct on her part in relation to the second will, nor that Will was not in full possession of his faculties. The will we are asked to uphold leaves to plaintiff full power to designate the nieces and nephews of Will and Nettie (whose death occurred nearly 18 years ago) who are to receive the property. Under this will plaintiff could designate as beneficiaries only Nettie's nieces and nephews and exclude Will's. There is no evidence to show what the relationship was, whether cordial or otherwise, between Will and any of Nettie's nieces or nephews, nor that any of them have any claim upon his bounty.

After full consideration of all contentions urged the decree is—Affirmed.

OLIVER, THOMPSON, and THORNTON, JJ., concur.

HAYS, J., concurs in result.

LARSON and PETERSON, JJ., dissent.

BLISS and SNELL, JJ., take no part.

HAYS, J.—I concur specially. Plaintiff contends the two wills are mutual, that is, executed pursuant to an agreement, and seeks specific performance of such agreement. I assume them to be mutual.

It seems to me the real question is—what are the terms and conditions of the agreement? There is nothing in either

will, standing alone, that indicates a prior agreement or that places any restrictions upon the maker thereof. It is ambulatory as most wills are.

William's will gives to his wife all of his property that he owns at the time of his death, to be her own subject to a condition if she survives him. The will then provides: *If he survives her,* then such property as would have gone to her, had she survived him, shall go to the plaintiff, as trustee. Thus, under this contingency, plaintiff's interest in the estate is entirely contingent upon William making no revocation or change in that will. In the event that *he dies before his wife,* his will provides that all property owned by him at time of his death shall go to her with the proviso that if such property is not disposed of by her, by will or otherwise, at the time of her death, it shall go to the plaintiff, as trustee. Thus whatever interest plaintiff may have in his estate, under this contingency, is dependent upon whether or not she disposed of that property, during her lifetime, *by will or otherwise.* Clearly, under this proviso, she is free to do with this property as she pleases.

Nettie's will is identical to his except for the transposition of names. Under her will, standing alone, plaintiff's rights to any of her property are exactly the same as above set forth in reference to William's will.

Reading each will in the light of the other and considering them together, it seems clear that neither William nor Nettie was much concerned as to what became of his or her property, in the event he or she died first, after the survivor was through with it. This is emphasized by his or her authorization to the survivor to dispose of such property during his or her lifetime, by will or otherwise, with only such that might remain undisposed of going to the plaintiff, as trustee. If each will had merely authorized "disposal during her or his lifetime" it might be argued that the survivor might dispose of such as was necessary for his support, see Sample v. Butler University, 211 Ind. 122, 4 N.E.2d 545, 5 N.E.2d 888, 108 A. L. R. 857, and annotation at page 867, but by the inclusion of the words *"by will or otherwise"* this interpretation is clearly eliminated.

Under plaintiff's theory, these two wills must be construed

as follows: each testator restricted the use of his property, if he was the survivor, but left it unrestricted in case he died first; as survivor, his use of his own property was restricted by his will, which became irrevocable upon death of the other, and plaintiff's rights became vested at least to the extent that there could be no disposal by a new will, yet, under the terms of the wills, he could dispose of whatever he may have received from her by another will. This position is of course untenable.

It seems to me that when a will says "all property owned by me at the time of my death" it will include whatever property he might receive under the will of the other, as surviving spouse. In the light of this reciprocal disposal clause, *by will or otherwise*, the fair and logical conclusion is that each, after the death of the other, had a right to do as he pleased with all property then held by him, even to the extent of executing new wills, and that plaintiff's interest therein was conditioned upon that contingency. In other words, do with his own as he could do with hers. William, by execution of the later will, did what he had a right to do and thereby eliminated plaintiff. He having no rights in the property, his suit for specific performance must fail.

Furthermore, the rule appears to be that specific performance demands a degree of certainty and definiteness which leaves in the mind of the court no reasonable doubt as to what the parties intended under their agreement, and no doubt of the specific thing equity is to compel to be done. 49 Am. Jur., Specific Performance, sections 22–25. Under this entire record such certainty, in my judgment, cannot be found and for this reason, if no other, this action must fail.

LARSON, J. (dissenting)—I respectfully dissent. I cannot concur with the majority for the reason that I find clear and convincing evidence of substantial and adequate consideration to require the enforcement of the provisions of the mutual or contractual wills of the parties.

Will purchased the 160-acre farm involved herein in 1909, married Nettie in 1923, and they lived and worked together, mostly on this farm, until her death on April 20, 1943, less than a year after the execution of the mutual wills on October

16, 1942. At the time of their marriage the farm was heavily mortgaged, but it was all paid within three years after Nettie's death and more than a year before he married Lillie.

Can it be denied, under these circumstances, that by the joint efforts of Will and Nettie over a period of 19 years the estate held by Will at the time of the execution of the mutual wills was not created or built up? To me it is unjust and unrealistic to say that Nettie had no interest in this farm which equity would recognize in an action to enforce the contractual or mutual wills. Culver v. Hess, 234 Iowa 877, 14 N.W.2d 692.

It greatly disturbs me for the further reason that by such decision, and perhaps the one in Levis v. Hammond, 251 Iowa 567, 100 N.W.2d 638, we appear to be departing from the sound and clear pronouncements of this court on such matters in In re Estate of Johnson, 233 Iowa 782, 790, 10 N.W.2d 664, 668, 148 A. L. R. 748, and citations therein. It is true in the latter case we denied specific performance of a so-called mutual will, but under those facts no other decision was just and equitable. There the mutual will was executed a few days after the marriage, and there was no showing that the wife furnished anything in the way of a consideration for the contractual obligation. We said therein, "His estate, which was substantial and apparently free from debt, was neither *created nor built up by the joint efforts* of his wife and himself." (Emphasis supplied.)

Here the very opposite is true. Will had no substantial estate when he and Nettie were married, and what he had was heavily mortgaged. Clearly, by their joint efforts, much of the estate Will had at the time of the execution of the mutual wills was created and built up. Surely a court of equity will look beyond the bare title in such cases and, if it finds an adequate consideration, actual or equitable, it will decree performance of the wills not revoked during the life of the parties.

Since we are re-examining our position as to adequate consideration necessary to support a mutual or contractual will, I also suggest we consider the fact that by such will Nettie surrendered her statutory inchoate right in the property of her husband, and also gave up her right to pass her estate to someone other than those mentioned in the mutual wills.

Referring again to the Johnson case, supra, we said that because the wife had no substantial estate at that time, as did the spouse in the case of Campbell v. Dunkelberger, 172 Iowa 385, 392, 153 N.W. 56, we would not find therein a sufficient detriment to sustain the suit. The facts are quite different here, and to me it is inconceivable to say that Nettie, after all her joint efforts with Will, did not sufficiently contribute to the estate of her husband so that she gave up nothing when she executed the mutual will. It seems evident she suffered a real detriment when she gave up her statutory inchoate right in the property held by her husband. Apparently it was earned.

Equity looks to the substance rather than the form, and who can say under this record that Nettie did not, by her joint efforts with Will, furnish present, adequate and substantial consideration, or that it was not contemplated and acknowledged by the parties at the time of the agreement? I would hold it was sufficient to sustain a suit for specific performance, and believe that any other valuation of the efforts of a faithful spouse over such a period of time is unthinkable.—I would reverse.

PETERSON, J., joins in this dissent.