GLADYS POWERS, appellant, v. WALTER PEARL PERRY, individually and as executor of estate of Clara May Perry, deceased, et al., appellees.

No. 52104.

July 14, 1966.

Bray, McCoy & Faulkner, of Oskaloosa, for appellant.

Bailey C. Webber, of Ottumwa, for appellees.

STUART, J.—Plaintiff seeks to establish the separate reciprocal wills of Ira Edward Perry and Clara May Perry, husband and wife, as mutual wills and asks for specific performance of the oral contract alleged to have been entered into by the parties at the time the wills were executed.

On January 28, 1941, the Perrys executed separate, but reciprocal, wills, which contained the following pertinent provisions:

"Second. I give, devise and bequeath to my beloved husband Ira Edward Perry, (wife Clara May Perry) all of my property, which I have or possess at the time of my death to be his (hers) absolute and without reservation.

"Third. It is my further desire, that in case Ira Edward Perry (Clara May Perry) precedes me in death, I give, devise and bequeath to Walter Pearl Perry, and Gladys K. Perry Reisman, all of my property real and personal which I may have upon my death, share and share alike."

Ira died in 1952. His will was probated and Clara took possession of the property under its terms. On November 14, 1961, Clara executed a second will which devised and bequeathed all of her property to Walter Pearl Perry. This action was commenced after this will was probated. The trial court held plaintiff failed to show by the required quantum of proof that there was a contractual arrangement between the parties at the time the reciprocal wills were executed which prevented the survivor from revoking the will if he or she desired. We agree.

I. We defined "joint", "reciprocal" and "mutual" wills in Father Flanagan's Boys' Home v. Turpin, 252 Iowa 603, 607, 106 N.W.2d 637, 639, 640.

"* * * in order for either maker of an alleged mutual will to be denied the right to revoke, it must appear by clear and satisfactory evidence, or on the face of the wills, they were executed pursuant to such contract provisions between the makers." Youngberg v. Holstrom, 252 Iowa 815, 818, 108 N.W.2d 498, 499.

To establish such contract by the required quantum of proof there must be clear, satisfactory and convincing evidence apart from the execution of reciprocal wills. In re Estate of Lenders, 247 Iowa 1205, 1214, 78 N.W.2d 536, 541; In re Estate of Ramthun, 249 Iowa 790, 802, 89 N.W.2d 337, 344; Allinson v. Horn, 249 Iowa 1351, 1356, 92 N.W.2d 645, 648; Barron v. Pigman, 250 Iowa 968, 972, 95 N.W.2d 726, 729; Levis v. Hammond, 251 Iowa 567, 100 N.W.2d 638, 640, 641; Father Flanagan's Boys' Home v. Turpin, supra, 252 Iowa 603, 106 N.W.2d 637, 639–641; Youngberg v. Holstrom, supra; In re Estate of Logan, 253 Iowa 1211, 115 N.W.2d 701, 704, 705; Vilter v. Myers, 255 Iowa 818, 123 N.W.2d 334, 336, 337.

Plaintiff and defendant, Walter Pearl Perry, were respectively the niece and nephew of Ira Edward Perry and Clara May Perry and are sister and brother. Both their parents died and in 1916 they went to live with the Perrys. Plaintiff left the home in 1917. Walter lived with them until his marriage to Ethel Jane in 1921. The relationship continued to be close and both plaintiff and defendant visited frequently in the Perry home.

In December 1940, plaintiff, then a widow, was invited to Sunday dinner at the Perry home with Edward A. Schmidt, an Oskaloosa attorney. Clara told Mr. Schmidt she and Ira wanted to make wills. He testified:

"I drew the wills as directed by them. I remember what they said to me and what I said to them about what they wanted. They didn't tell me how the will was to be made. I did ask them what they wanted in the will and drew the will accordingly. When I asked what they wanted in the will I remember what they said and it was put in the will. * * *

"Q. What did they say they had agreed to do? A. They said they had agreed about a will. They asked me whether I

could draw the will, and I told them I could. I drew the wills like they told me.

"Q. You may state whether or not either of them said to you what they had made an agreement among themselves about the way they wanted to dispose of their property? A. Yes.

"Q. Now you may state what either one of them said to you about how they agreed to dispose of their property. A. They stated they wanted the property to the survivor, the survivor to inherit the property and at their death, when they were gone, the property was to be divided equally between Gladys K. Reisman and Walter Perry.

"Q. That is what they told you? A. That is what they said."

Sometime in December 1940 "I handed the wills to them and told them to look them over, and if there were any changes they wanted to make, to tell me what they were, and I would rewrite them.

"I put in the will what the conversation was about and how they wanted it, and that is all the conversation I had with them about making wills that I am relating. * * *

"Q. Conversation, the conversation was testified they told you they had made an agreement to do it a certain way? A. They told me they had agreed to make a will and wanted me, ask if I could do it for them."

Plaintiff testified:

"My aunt said to Ed Schmidt, Ed and her wanted to make wills disposing of their property and asked if he could make them and he said he could and asked her how they wanted to dispose of their property. She said Ed and I have agreed that the first one to die, the other one is to have all the property and then when the last one dies what is left is to be divided equally between Walter and Gladys, that is, Walter Perry and Gladys Reisman."

Mrs. Cynthia Rupe, a friend of Mr. and Mrs. Perry since she was a little girl, took Mrs. Perry to the office of Arthur McGivern in Ottumwa where her second will was drawn. She and Mrs. Perry picked it up at a later date and took it to Hedrick where it was executed. She had talked with Mrs. Perry on occasions

after Mr. Perry's death concerning the disposition of her property. She testified:

"I had taken (Mrs. Perry) down to the farm one time to spend the day working, and I was working in the house and Mrs. Perry began to tell me that she wanted to make a different will. Before Ed had died, he had asked her to be sure and make another will and not leave Gladys a thing. She told me Ed had been very upset when he found that the wills were not in their safety deposit box in the bank, and he had become quite angry that they had not been put there, and he had asked her to because things in the will had been left in May's possession that it was hers to do with for her to change the will after he was gone. The bank referred to was in Hedrick.

"Mrs. Perry felt a little reluctant to change the will. She said she felt that it would cause hard feelings, but she kept going back to the statement it was the way Ed wanted her to do it."

On cross-examination she said:

"I testified Mrs. Perry told me by this will how the property would be divided at her death. She told me the will was written such that everything was left to her after Ed's death. She said it was hers as long as she was living.

"I knew about the wills that Mrs. Perry and her husband, Ed, made, she told me about them. I knew they had made wills. I did not know how those wills were made except that everything was left to her was the statement she made. She told me that by the 1941 [1940] will the property was hers as long as she was living, as testified in my deposition."

 This is the sum of the testimony which relates to the circumstances surrounding the execution of the reciprocal wills and constitutes plaintiff's proof of a binding agreement to will the property in the manner set forth in the wills. We do not believe it is sufficiently clear, satisfactory and convincing to establish such an agreement. As the trial court pointed out, "There is absolutely no evidence indicating or even suggesting, that Clara and Ira intended, understood or agreed that the survivor of them would be denied the right to revoke his or her will and no such provision was incorporated in the wills drawn pursuant to their request."

 The fact they agreed at the time the wills were dis-

cussed they wanted the property to go to certain persons is no proof they wanted to make this disposition binding on the survivor. In fact language in the will of Ira giving his property to Clara "to be hers absolute and without reservation" seems to negative any agreement binding her not to change the provisions of her will. There was no evidence here Mr. Schmidt informed the Perrys the execution of these separate reciprocal wills could not be revoked after the death of one of them. Nor is there any evidence either party had that conception of the transaction. Actions and statements of Mrs. Perry indicate otherwise. Her actions are contrary to the statement "it was hers for life". Neither party claims she was limited to a life estate.

In Barron v. Pigman and Levis v. Hammond, both supra, parties were advised by the attorneys they were executing an irrevocable contract. We believe the facts here most closely parallel those of Father Flanagan's Boys' Home v. Turpin, supra. We distinguished it from the Barron case with the following language on page 611 of 252 Iowa:

"Where Mr. Nelson, the attorney who drew the wills in the Barron case, testified he told the parties the wills would be irrevocable and they agreed, Mr. Batschelet here makes no such statement. He may have thought the will was mutual; in fact he advised Elsie M. Turpin after her husband's death it could not be changed; and in the state of the law at the time the will was drawn, such a belief may be understood. But he does not say he advised the parties at the time of execution of the will or any previous time they were making an irrevocable instrument, or give any other testimony from which a binding agreement between them may be inferred. So far as his testimony goes, Berthel and Elsie Turpin advised him they wanted a joint and reciprocal will drawn; it goes no further."

This same distinction is applicable here.

Much of the evidence was objected to as being incompetent under the dead man statute, section 622.4, Code of Iowa, the parol-evidence rule, and the statute of frauds. These and other matters raised by appellee are moot in view of our holding the evidence was insufficient, if admissible.

This case is affirmed.—Affirmed.

All JUSTICES concur.